COMMONWEALTH *vs.* JEFFREY BRITTO.

Plymouth. October 3, 2000. - March 30, 2001.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Practice, Criminal,* Assistance of counsel, New trial, Jury and jurors, Duplica-
tive convictions, Capital case. *Constitutional Law,* Assistance of counsel.
*Attorney at Law,* Attorney-client relationship. *Evidence,* Hearsay,
Videotape. *Identification. Jury and Jurors. Robbery.*

A Superior Court judge did not abuse his discretion in denying a criminal
    defendant's pretrial motions for discharge of his appointed counsel, where
    the defendant did not demonstrate good cause for such removal. [599-601]
A criminal defendant did not demonstrate that he received ineffective as-
    sistance of counsel at trial by reason of counsel's failure to call three wit-
    nesses or to impeach three witnesses who testified, where counsel's tactics
    were not manifestly unreasonable [601-606]; by reason of counsel's failure
    to obtain an independent medical examination, where there was no show-
    ing of what favorable evidence would have been produced [606-607]; or
    by reason of an asserted breakdown of communication between the
    defendant and counsel, where the assertion was not supported by the rec-
    ord and there was no showing that the defendant was deprived of any
    substantial ground of defense or received a trial that was unfair [607-608].
There was no error or abuse of discretion in a trial judge's ruling on a criminal
    defendant's motion for a new trial without conducting an evidentiary hear-
    ing, where the defendant's motion and affidavit did not raise a substantial
    issue. [608]
At a murder trial, hearsay statements of a witness, made after he had identi-
    fied the defendant in a lineup, that corroborated the identification, were er-
    roneously admitted in evidence, but did not prejudice the defendant in light
    of strong evidence, properly admitted, of his guilt. [608-610]
There was no merit to a criminal defendant's contention that the judge's deci-
    sion to afford the jurors an opportunity to ask questions deprived him of a
    fair trial [610-611], and nothing in the three juror questions cited by the
    defendant was prejudicial [611-612]. COWIN, J., concurring.
Discussion of procedures to be used in soliciting questions from jurors in
    criminal cases. [612-615]. COWIN, J., concurring.
An armed robbery conviction that was the underlying basis of a felony-murder
    conviction merged into the murder conviction. [615]

INDICTMENTS found and returned in the Superior Court Depart-
ment, one on April 8, 1996, and two on June 3, 1996,
respectively.

The cases were tried before *Charles J. Hely,* J., and a motion for a new trial was considered by him.

*Charles K. Stephenson* for the defendant.

*Mary E. Mullaney,* Assistant District Attorney, for the Commonwealth.

The following submitted briefs for amici curiae:

*Catherine K. Byrne,* Committee for Public Counsel Services & *John F. Palmer,* for Committee for Public Counsel Services & another.

*Michael Keating, Mitchell J. Matorin, Elizabeth Heinrich & Marc G. Perlin* for National Center for Citizens Participation in the Administration of Justice.

*Thomas F. Reilly,* Attorney General, & *Pamela L. Hunt,* Assistant Attorney General, for the Attorney General.

SPINA, J. The defendant, Jeffrey Britto, was convicted of murder in the first degree on a theory of felony-murder, armed robbery while masked, and unlawful possession of a firearm. Represented by new counsel on appeal he claims error in (1) the judge's refusal to appoint new counsel before trial; (2) the denial of his motion for a new trial based on ineffective assistance of counsel; (3) the admission of statements made by an identification witness after a lineup procedure had concluded; and (4) the judge's decision to permit jurors, without prior consultation of the parties, to submit questions to witnesses at trial. Additionally, he asks that his conviction of armed robbery while masked, the underlying felony in the murder conviction, be vacated as duplicative. We affirm the convictions for murder in the first degree and unlawful possession of a firearm, and vacate the conviction of armed robbery while masked. We decline to exercise our power under G. L. c. 278, § 33E.[1]

We summarize the facts the jury could have found, reserving other details for discussion of the issues. The victim, Rose Marie Delsie, lived in a first-floor apartment in Brockton. Begin-

---

[1]We acknowledge the submission of the following amicus briefs: Attorney General of the Commonwealth; District Attorney for the Hampden District; District Attorney for the Northern District (Middlesex County); District Attorney for the Suffolk District; Committee for Public Counsel Services; Massachusetts Bar Association; and the National Center for Citizens Participation in the Administration of Justice.

ning on February 21, 1996, and continuing through the morning of February 22, Delsie and her friend, Cynthia Holiday, binged on cocaine and heroin in Delsie's apartment. Holiday left periodically to replenish their supply of drugs. At one point, on February 22, she left and returned with Robert Zine, who joined the women in smoking crack for the rest of the morning. Around noon that day, Holiday paged a regular drug contact, codefendant Howard Allen, and asked him to bring more drugs to Delsie's apartment.

Shortly after Allen arrived, the defendant entered the apartment while masked and demanded cash and other valuables at gunpoint. He said he had been watching the place for the past couple of weeks and knew there were "goods" there. Delsie took a gun from her night stand and shot him. The defendant returned fire. One projectile perforated Delsie's lung and several major blood vessels. She died as a result.

At trial, identity was the principal issue. Zine testified that, as he and Holiday approached Delsie's house, he saw a black man resembling the defendant in skin tone and height leaning against the house, but he could not make a positive identification. Zine had known the defendant for several years. Although the defendant's head and face were covered during the robbery, Zine recognized him by his eyes.

Robert Senter, Delsie's upstairs neighbor, heard gunshots at approximately noon on February 22. He looked out his front window and saw a black man wearing a hooded sweatshirt emerge from the house and look back into Delsie's apartment. The man was holding a gun similar to one Delsie had shown Senter in her apartment. Senter watched him approach a red van, later identified as Allen's, look inside, as if checking for keys, and then glance toward the building. Senter had a clear view of the man's face. At a lineup several months later, Senter said the defendant looked like a man that could be the gunman. The police officer who drove Senter home after the lineup asked if he was positive about the identification. Senter stated he was sure because he knew what it was "like to be locked up" and did not "want to identify someone who didn't do it." He identified the defendant at trial. The lineup procedure had been preserved on videotape and shown to the jury.

On the evening of February 22, the defendant and Allen went to an apartment where the defendant was staying with Willie Lee Harris and Harris's girl friend.[2] It appeared to Harris, who was in the apartment, that something was wrong with the defendant. The defendant went directly to his room, accompanied by Allen. Allen left, returned, then left again. Harris · looked in the defendant's room and saw him lying on his side, apparently hurt. There were medical supplies on the table by the bed. The next day the defendant emerged from his room walking with difficulty. Harris asked him what happened. The defendant replied that he had been shot during an argument. A pathologist retained by the Commonwealth examined the defendant on April 1, 1996, and saw a hip wound consistent with a grazing gunshot that was approximately six weeks old.

Approximately one month after the shooting the Brockton police entered the Harris apartment with a search warrant in an unrelated matter. The defendant was present, and he was holding the victim's gun. When he saw the police, he dropped the gun and said he was just visiting, adding that the gun was there when he arrived. Harris had seen the defendant with the gun several days after the shooting.

1. *Motions for appointment of new counsel.* Six months before trial, beginning in November, 1997, the defendant filed the first of four pro se motions he would file seeking to discharge counsel and have new counsel appointed. Each motion alleged an irreconcilable breakdown in communication with counsel. The first was denied on December 17, 1997. He filed a second motion on January 5, 1998. Counsel moved to withdraw on January 7, 1998. Another judge, who was to be the trial judge, denied those motions on January 7, 1998.[3] In early March, counsel filed a motion for reconsideration of his motion to

---

[2]Howard Allen was convicted of being an accessory after the fact to murder and robbery, G. L. c. 274, § 4, following his joint trial with the defendant.

[3]The defendant was not transported to court on January 7, 1998, for the hearing on counsel's motion. The hearing proceeded without him. It was error to proceed without him, *Commonwealth* v. *Moran*, 388 Mass. 655, 659-660 (1983), but the defendant has not shown that his motion did not express completely his position at the time, or that he did not have the opportunity to present his position at the several hearings on his subsequent motions for new counsel or on counsel's motion for reconsideration.

withdraw, citing continuing conflict with the defendant. That motion was denied by the trial judge. The defendant's third and fourth motions were filed on April 9 and April 13, 1998, respectively. Those motions were heard and denied on the first day of trial, May 4, 1998. The defendant argues that the denial of each of these motions was an abuse of discretion and a violation of his right to counsel under the Sixth Amendment to the United States Constitution.

The Sixth Amendment guarantees the right to effective assistance of counsel, but it "does not invariably require a 'meaningful attorney-client relationship.' " *Commonwealth* v. *Tuitt*, 393 Mass. 801, 806 (1985), citing *Morris* v. *Slappy*, 461 U.S. 1, 13-14 (1983). It does not guarantee the right to any particular court-appointed counsel. See *Commonwealth* v. *Moran*, 388 Mass. 655, 659 (1983). The defendant has the burden of showing good cause to remove appointed counsel. See *Commonwealth* v. *Chavis*, 415 Mass. 703, 712 (1993). Good cause includes, but is not limited to, "a conflict of interest, incompetence of counsel, or an irreconcilable breakdown in communication." *Id.* "[T]he decision to honor a defendant's request for change of appointed counsel is a matter left to the sound discretion of the trial judge, but after he has given the defendant the opportunity to articulate his reasons." *Commonwealth* v. *Moran, supra* at 659. There is no bright-line test. "[T]he judge must blend 'an appreciation of the inevitable difficulties of trial administration with a concern for constitutional protections.' " *Commonwealth* v. *Dunne*, 394 Mass. 10, 14 (1985), quoting *United States* v. *Poulack*, 556 F.2d 83, 86 (1st Cir.), cert. denied, 434 U.S. 986 (1977).

This case is somewhat unusual in that the defendant requested new counsel well in advance of trial, so it is unburdened by the most common problem accompanying this scenario, namely, the need for a continuance of the trial if the motion is allowed. See, e.g., *Commonwealth* v. *Diatchenko*, 387 Mass. 718, 727-728 (1982). The assertions in these motions and affidavits, however, do not indicate any likelihood that the defendant's right to the effective assistance of counsel was in jeopardy.

There was no allegation that counsel was not prepared, and counsel never said he was unprepared. See *Commonwealth* v.

*O'Brien*, 380 Mass. 719, 723 (1980); *Commonwealth* v. *Cavanaugh*, 371 Mass. 46, 52-54 & n.3 (1976) (reversal required where counsel said he was unprepared). The trial judge noted that counsel was one of the most effective criminal defense lawyers in the area. Counsel's mere failure to meet all the defendant's demands, many of which were unreasonable or unrealistic, does not equate with an irreconcilable breakdown of communication. If it did, the administration of trials could be brought to a grinding halt with relative ease, just for the asking.

The ultimate question is whether the defendant likely would be denied the effective assistance of counsel if counsel is not removed. See *Commonwealth* v. *Miskel*, 364 Mass. 783, 790 (1974). We are satisfied that, based on what was presented at the time the motions were made, the defendant failed to make the requisite showing. There was no abuse of discretion in the denial of his or counsel's motions. Because the defendant also raises the issue of an irreconcilable breakdown of communication in his motion for a new trial, we will revisit the issue to see if there was such a breakdown during the trial and, if so, whether it "led to an apparently unjust verdict, prevented an adequate defense, or threatened the defendant's right to a fair trial." *Commonwealth* v. *Chavis*, *supra* at 712 n.12, citing *Commonwealth* v. *Tuitt*, *supra* at 806.

2. *Motion for a new trial.* In his motion for a new trial the defendant cites five instances in which he claims to have been denied the effective assistance of counsel. He also claims error in the denial of his motion for a new trial without a hearing.

To prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate that "there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Because the defendant has been convicted of murder in the first degree we review the denial of his motion for a new trial, raised in conjunction with his direct appeal, under G. L. c. 278, § 33E, which provides a "standard . . . that is more favorable to a

defendant than is the constitutional standard for determining ineffectiveness of counsel.'' *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). The focus of our review is not solely the adequacy of trial counsel's representation, but also ''whether there was an error . . . (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion.'' *Id. Commonwealth* v. *Mello*, 420 Mass. 375, 393 (1995). We turn to the defendant's assignments of error.

(a) *Failure to present material witnesses.* The defendant faults counsel for not calling three neighborhood residents who allegedly made observations relevant to the issue of identification. The defendant has not submitted affidavits from the three prospective witnesses, but relies on discovery materials provided to trial counsel by the Commonwealth. The motion judge, who was also the trial judge, was entitled to rely on his familiarity with the trial when deciding the motion. See *Commonwealth* v. *Nieves*, 429 Mass. 763, 771 (1999). He concluded that the impact of these additional witnesses was marginal at best, and that the decision not to call them was not manifestly unreasonable. The judge's findings are entitled to special deference. *Id.*

Whether to call a witness is a strategic decision. See *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978). ''An attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made.'' *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998), citing *Commonwealth* v. *Roberts*, 423 Mass. 17, 20 (1996). The testimony of two of the three witnesses was merely cumulative of other testimony. There was no error in not calling them. See *Commonwealth* v. *Sarmanian*, 426 Mass. 405, 406-407 (1998) (counsel's failure to call additional witnesses to bolster intoxication claim did not amount to ineffective assistance of counsel where evidence from additional witnesses would have been cumulative, not dispositive). As to the third witness, counsel was able to elicit testimony from a State trooper about a composite drawing he created from the witness's description and to note discrepancies between that composite and the defendant's appearance, thereby making the point that the witness would contribute while eliminating the risks of cross-

examination. Counsel's decision not to call these witnesses appears sound, and the defendant has failed to show that the testimony would have contributed materially to the defense or that counsel's failure to call them was manifestly unreasonable. There was no error.

(b) *Failure to impeach two government witnesses.* (i) *Zine.* The defendant next claims that Zine, who was incarcerated at the time of trial, should have been impeached with evidence of bias. The Commonwealth notified defense counsel before trial that it had promised Zine that it would make known to the sentencing judge at the time of his guilty plea to charges of larceny and assault that he had cooperated in this matter. No specific recommendation was promised. The Commonwealth honored its promise and in July, 1996, Zine was sentenced to two years in a house of correction, one year to be served, with the balance suspended. The prosecutor and a police sergeant also spoke on Zine's behalf at the time of his parole hearing. He was not granted parole. These events occurred before Zine testified at the defendant's trial. This evidence was never used to impeach Zine.

A defendant is entitled as a matter of right to reasonable cross-examination for the purpose of showing bias or motive. *Commonwealth* v. *Michel,* 367 Mass. 454, 459 (1975). Evidence of past benefits from cooperation may be used to show bias toward the Commonwealth even in the absence of currently pending criminal charges. See *Commonwealth* v. *Rodwell,* 394 Mass. 694, 700 (1985) ("bias because of gratitude for past benefits from the Commonwealth might be relevant, but, at the same time . . . the pendency of criminal charges is a much stronger source of human motivation"). Nevertheless, the decision to impeach a witness remains a tactical one in which a great amount of discretion is vested in the attorney. See *Commonwealth* v. *Mitchell,* 428 Mass. 852, 855 (1999); *Commonwealth* v. *Hicks,* 375 Mass. 274, 277 (1978).

Had defense counsel impeached Zine as the defendant now suggests, the Commonwealth could have rehabilitated him with evidence that, after the Commonwealth honored its promise to Zine and before he testified at the defendant's trial, Zine was again arrested in August, 1997, for larceny. He was sentenced to

two years in a house of correction, with no consideration given for his cooperation in this case. In addition, there was evidence of Zine's prejudice against the Commonwealth, which he expressed during a conversation with a correction officer, to the effect that he planned to use the district attorney's office to help him with cases he had pending and then to "[m]ake them look like idiots in the courtroom" when called to testify. This evidence, of which defense counsel had been made aware through discovery, likely would have erased any suggestion of bias, and only bolstered Zine's credibility. Defense counsel appears to have acted astutely by avoiding the problem and concentrating instead on a safer and more fertile means of impeachment: by Zine's prior convictions.

The judge found that defense counsel was highly effective in his cross-examination of Zine by "concisely focus[ing] the jury's attention on Zine's numerous past convictions and sentences, his release from jail a week before the murder, his return to jail thereafter, his court defaults, his use of cocaine on the morning of the offense, and his extensive prior history of cocaine abuse." Noting that "[e]ffective representation does not mandate the use of every possible impeachment item," the judge determined that this. evidence was ample to impeach Zine's credibility, and therefore, it was not error to decide not to introduce additional evidence of bias. The judge's findings are entitled to substantial deference. See *Commonwealth* v. *DeVincent,* 421 Mass. 64, 69 (1995).

We have never held that a lawyer must pursue every possible avenue in order to forestall an ineffective assistance claim. Cf. *Commonwealth* v. *Blake,* 409 Mass. 146, 162 (1991) ("counsel was not obliged to pursue all theoretical defenses, no matter how little basis in the evidence existed for them"). While a complete failure to impeach Zine's testimony on any basis might rise to the level of ineffective assistance of counsel, counsel's decision not to impeach Zine with evidence of bias based on a nonspecific plea agreement nearly two years before his testimony at this trial that brought little discernible benefit, especially where he received an intervening sentence with absolutely no benefit for his past cooperation, and where he also expressed to a guard his hostility toward the Com-

monwealth and the intent to impair the Commonwealth's case against the defendant, was not manifestly unreasonable. There was no error.

(ii) *Holiday.* There was testimony before the grand jury that Holiday "was in on the robbery" and had an arrangement with "the fellow that was going to rob her."[4] Holiday was to keep half the heroin stolen and the man could keep any money he took. Counsel did not offer any of this evidence at trial. The defendant claims that the failure to impeach Holiday with this information constituted ineffective assistance of counsel.

On the first day of trial, Holiday was unable to identify the defendant as the assailant. On the second day, the prosecutor reported that, on her way home from court the day before, Holiday told her that she recognized the defendant as the shooter by his eyes. Counsel was successful in preventing Holiday from giving this testimony at trial. As the judge noted, "when [counsel] resumed his cross-examination of Holiday he was facing a witness who could identify the defendant as the shooter but had not yet been permitted to do so." If counsel had impeached her with evidence which linked her in a conspiracy with the defendant to rob Delsie on the day of her murder, he would have reopened the door to Holiday's failure to identify the defendant and thereby undermined the pivotal issue of the defense. Failure to pursue this risky line of impeachment was not manifestly unreasonable. See *Commonwealth* v. *Martin,* 427 Mass. 816, 822 (1998).

(c) *Failure to comply with reciprocal discovery.* At trial, Officer William Baxter of the Boston police department, an acquaintance of the defendant, testified that he was with the defendant several weeks to one month after the incident and noticed the defendant was limping. The defendant alleges that defense counsel failed to impeach Baxter with a prior inconsistent statement that the defendant was not limping, taken by counsel's investigator, because he had failed to turn over the investigator's report to the prosecutor in conformity with an agreement for reciprocal discovery.

The defendant ignores defense counsel's primary concern

---

[4]Cynthia Holiday was not indicted for any crime arising out of this incident.

with Baxter's testimony, which had nothing to do with whether the defendant had a limp from which the jury might infer he had been wounded. There was overwhelming evidence that the defendant had sustained a hip wound on the day of the murder. Defense counsel was concerned with damaging testimony Baxter gave about a conversation he had with the defendant during which the defendant inquired about progress the police were making toward solving Delsie's murder. Baxter asked if the defendant knew Delsie, to which he replied that he knew of her. Defense counsel anticipated the Commonwealth's argument that the defendant asked about Delsie to see if the police were making any progress that might result in his arrest. On cross-examination defense counsel made much of the fact that the conversation was just small talk between two acquaintances about current events, and he stressed the point in his closing. This tactic was not manifestly unreasonable. The judge did not err in concluding that the failure to impeach this witness with his inconsistent statement about the defendant's limp would have carried very little weight.

(d) *Failure to obtain an independent medical examination.* At trial there was conflicting testimony as to where Delsie had wounded the gunman. Zine originally claimed that the intruder had been shot in the chest, but testified at trial that he was struck in the hip. Holiday testified that the intruder was struck in the hip and reported seeing him "pawing" at his left side. Defense counsel obtained funds for an independent medical examination and, although he repeatedly promised the defendant that he would arrange the examination, no examination was ever scheduled. The defendant argues that defense counsel's failure to secure the independent medical examination deprived him of the effective assistance of counsel.

There was uncontradicted testimony from the Commonwealth's pathologist that scar tissue is completely formed approximately six months after an injury occurs, and therefore after six months, wounds are impossible to date because of the healing process. Here, the funds for the medical examination were not awarded until August 16, 1996, almost exactly six months after the shooting. The defendant does not claim error from any delay in making the motion for a medical examination.

Instead, he claims that the failure to arrange the examination, itself, constitutes prejudicial error. The defendant has offered no affidavit specifying what favorable evidence an independent examination likely would produce, and he offered no alternative explanation for his wound that potentially could have been confirmed by such an examination. Moreover, the defendant does not dispute the accuracy of the pathologist's testimony about the location and nature of his wounds. In light of his admission that he had been shot on the same day as Delsie's murder, it is difficult to imagine how a medical examination would have assisted in his defense.

Defense counsel elicited favorable medical testimony without the need for an independent medical examination. On direct examination the Commonwealth's pathologist testified that the defendant likely sustained the injury approximately six weeks prior to his examination of April 1, 1996. The pathologist's time frame thus placed the date of the defendant's wound at about the date of the murder. Defense counsel skillfully coaxed the pathologist to revise this estimate to anywhere from four to eight weeks, expanding the possible time of the injury from a forensic perspective to significantly before or significantly after the incident. In his closing, defense counsel stressed that the wound could not actually be dated as precisely as the Commonwealth suggested. The defendant has failed to demonstrate he was denied effective assistance of counsel.

(e) *Failure to maintain communication with client.* The defendant renews the argument made in his pretrial motion for new counsel that defense counsel failed to maintain adequate communication with him. He asserts that counsel neglected to keep him informed about the current status of his case and neglected repeatedly to respond timely to his requests for investigation and pretrial action on motions.

The "appropriate [Sixth Amendment] inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer." *Commonwealth* v. *Tuitt,* 393 Mass. 801, 806-807 (1985), quoting *United States* v. *Cronic,* 466 U.S. 648, 657 n.21 (1984). The judge determined that "[a]ny lapse in communication between [counsel] and the defendant prior to trial was based solely on the defendant's unfounded lack of trust." He

noted that by the time of trial the situation had repaired itself and that the defendant sat with counsel during the trial and the two "consulted frequently." The judge also determined that defense counsel was "thoroughly prepared . . . and well organized." His findings are entitled to substantial deference. See *Commonwealth* v. *DeVincent*, 421 Mass. 64, 69 (1995).

Even if there were a breakdown, however, the defendant has failed to show how it "likely deprived [him] of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). We are not persuaded that there was an irreconcilable breakdown of communication, much less that the verdicts were unjust, that the defendant was prevented from presenting an adequate defense, or that he did not receive a fair trial because of any breakdown. See *Commonwealth* v. *Chavis*, 415 Mass. 703, 712 n.12 (1993).

(f) *Failure to hold evidentiary hearing on motion for a new trial.* The defendant assigns error to the judge's failure to hold an evidentiary hearing on his motion for a new trial. An evidentiary hearing is required if the motion and affidavits raise a substantial issue. Mass. R. Crim. P. 30 (c) (3), 378 Mass. 900 (1979). Whether a substantial issue has been raised depends on the seriousness of the issue and the adequacy of the defendant's showing. See *Commonwealth* v. *Stewart*, 383 Mass. 253, 257-258 (1981). The decision to hold an evidentiary hearing on a motion for a new trial is a matter committed to the sound discretion of the trial judge. See *Commonwealth* v. *Licata*, 412 Mass. 654, 660 (1992). The judge's conclusion that the defendant's motion and affidavit did not raise a substantial issue is entitled to substantial deference. See *Commonwealth* v. *DeVincent, supra* at 69. For reasons we have discussed, the motion and affidavits are not adequate to cast doubt on the effectiveness of counsel's performance. They do not, therefore, raise a substantial issue, and the judge properly decided the motion on the basis of the affidavits and his familiarity with the trial. See *Commonwealth* v. *Nieves, supra* at 771. There was no error.

3. *The admission of postidentification hearsay.* Two months after the murder Robert Senter participated in a police lineup in which he identified Britto as a man that "could be [the assailant]." The lineup was videotaped and admitted as an

exhibit at trial and the jury viewed it. Over the defendant's objection, the Commonwealth was permitted during its case-in-chief to introduce statements made by Senter after the conclusion of the lineup procedure while being escorted home in a cruiser. When questioned by the officer as to how sure he was about his identification, Senter stated he was sure because he knew what it was "like to be locked up" and did not "want to identify someone who didn't do it." The defendant does not dispute that the videotape of the lineup was properly admitted as nonhearsay corroborative testimony. See *Commonwealth* v. *Gunter*, 427 Mass. 259, 264 (1998). Rather, he argues that the Commonwealth was improperly permitted to bolster Senter's tentative identification at the lineup with the inadmissible hearsay of Senter's conversation with the officer after the lineup.

Testimony concerning an extrajudicial identification is admissible to corroborate an in-court identification. See *Commonwealth* v. *Repoza*, 382 Mass. 119, 129-130 (1980), *S.C.*, 400 Mass. 516, cert. denied, 484 U.S. 935 (1987); *Commonwealth* v. *Sheeran*, 370 Mass. 82, 87 (1976). Additionally, testimony concerning an extrajudicial identification consistent with the trial testimony of the identifying witness may be admitted for its probative value. See *Commonwealth* v. *Gunter*, *supra* at 264; *Commonwealth* v. *Daye*, 393 Mass. 55, 60 n.8 (1984). Whenever such testimony has been permitted, it has always been limited to the extrajudicial identification procedure. See, e.g., *Commonwealth* v. *Repoza*, *supra*; *Commonwealth* v. *Sheeran*, *supra*. We do not sanction the use of such corroborative testimony in a witness's direct examination regarding matters outside the extrajudicial identification procedure.[5] Here, the testimony involved a conversation that took place after the identification procedure had concluded. As such, it was inadmissible hearsay.

Although the judge erred in admitting these statements, the error was not prejudicial. The jury could evaluate for themselves

---

[5]There is no claim here that the testimony was a prior consistent statement admissible on redirect examination to rebut a suggestion of recent contrivance made during cross-examination. See *Commonwealth* v. *Kater*, 409 Mass. 433, 447-448 (1991). See also P.J. Liacos, Massachusetts Evidence § 6.16, at 338-339 (7th ed. 1999).

the strength of Senter's identification by viewing the videotape of the lineup. There was strong evidence, both identification and otherwise, linking the defendant to the murder. Thus, we cannot say the admission of these statements constituted reversible error. See *Commonwealth* v. *Wilson,* 427 Mass. 336, 348 (1998) ("The improperly admitted hearsay did not prejudice the defendant because it was merely cumulative of properly admitted evidence . . . [and] the defendant was not prejudiced in light of the other evidence of his guilt" [citations omitted]).

4. *The propriety of juror questions.* Without consulting counsel, the judge announced shortly after the jury were sworn that they would be permitted to pose questions to the witnesses. The jurors submitted over ninety questions for eleven of the nineteen witnesses who testified. Defense counsel and the prosecutor objected to the procedure. The defendant claims that the judge's decision to afford jurors the opportunity to ask questions, without consulting counsel, along with its attendant delay, confusion of the participants' roles, and the potential for premature and prejudicial fact finding by the jury, deprived him of a fair trial.

The defendant's contention that the process of jury questioning, itself, deprived him of a fair trial, is without merit. Like the majority of States,[6] we permit jurors to ask questions, subject to the discretion of the judge. See *Commonwealth* v. *Urena,* 417

---

[6]For a thorough treatment of the recent trend in juror questioning, see Note, Breaking the Silence: Should Jurors be Allowed to Question Witnesses During Trial?, 44 Vand. L. Rev. 117 (1991); Comment, Juror Questions: A Survey of Theory and Use, 55 Mo. L. Rev. 817 (1990).

Although varying in their approval and application, at least twenty-six States and the District of Columbia permit some form of juror questioning. See *State* v. *LeMaster,* 137 Ariz. 159, 163-164 (Ct. App. 1983); *Nelson* v. *State,* 257 Ark. 1 (1974); *People* v. *McAlister,* 167 Cal. App. 3d 633, 643-645 (1985); *Spitzer* v. *Haims & Co.,* 217 Conn. 532 (1991); *Yeager* v. *Greene,* 502 A.2d 980, 986 n.16 (D.C. 1985); *Watson* v. *State,* 651 So. 2d 1159 (Fla. 1994), cert. denied, 516 U.S. 852 (1995); *Matchett* v. *State,* 257 Ga. 785, 786 (1988); *Matheis* v. *Farm Feed Constr. Co.,* 553 N.E.2d 1241 (Ind. Ct. App. 1990); *Rudolph* v. *Iowa Methodist Med. Ctr.,* 293 N.W.2d 550, 556 (Iowa 1980); *State* v. *Hays,* 256 Kan. 48 (1994); *Slaughter* v. *Commonwealth,* 744 S.W.2d 407, 413 (Ky. 1987), cert. denied, 490 U.S. 1113 (1989); *People* v. *Heard,* 388 Mich. 182, 187-188 (1972); *State* v. *Graves,* 274 Mont. 264 (1995); *State* v. *Jumpp,* 261 N.J. Super. 514 (App. Div. 1993); *State* v. *Rodriguez,* 107 N.M. 611, 614 (Ct. App. 1988); *People* v. *Bacic,* 202 A.D.2d 234 (N.Y. 1994); *State* v. *Howard,* 320 N.C. 718, 726 (1987); *State* v. *Sheppard,*

Mass. 692 (1994). There we outlined the procedure to be followed when jurors are permitted to submit questions. See *id.* at 701-702. With the exception of prior consultation of the parties, the judge adhered to this procedure. The defendant has the burden of showing actual prejudice from juror questions. *Id.* at 699-700. He has not shown how the judge's failure to consult with the parties caused him any harm.

The defendant cites three instances of inappropriate juror questions that he contends prejudiced his case. The first involved an attempt by a juror to submit a question in the midst of counsel's interrogation. He does not demonstrate, however, how this interruption denied him a fair trial. The judge immediately gave a curative instruction, telling the jury that he would inform them when it was appropriate to submit their questions, and thereby eliminating any future interruptions. See *Dobbins* v. *United States*, 157 F.2d 257, 260 (D.C. Cir.), cert. denied, 329 U.S. 734 (1946) (defendant was not prejudiced by interrupting question where judge immediately admonished jurors to hold their questions until end of trial).

Second, the defendant highlights one juror question that included a comment on the evidence. The judge told the jury that they were "to not make sentences or comments, only to limit themselves to questions." The judge never read the comment aloud, so the other jurors were not exposed to it. The

100 Ohio App. 345, 390 (1955), aff'd, 165 Ohio St. 293, cert. denied, 352 U.S. 910 (1956); *Freeman* v. *State*, 876 P.2d 283 (Okla. Crim. App.), cert. denied, 513 U.S. 1022 (1994); *Boggs* v. *Jewell Tea Co.*, 266 Pa. 428, 434 (1920); *State* v. *Barrett*, 278 S.C. 414, 418 (1982), cert. denied, 460 U.S. 1045 (1983); *State* v. *Jeffries*, 644 S.W.2d 432 (Tenn. Crim. App. 1982); *Hudson* v. *Markum*, 948 S.W.2d 1, 2-3 & n.2 (Tex. Ct. App. 1997); *State* v. *Johnson*, 784 P.2d 1135, 1144-1145 (Utah 1989); *Williams* v. *Commonwealth*, 24 Va. App. 577 (1997); *State* v. *Munoz*, 67 Wash. App. 533 (1992); *Sommers* v. *Friedman*, 172 Wis. 2d 459 (Ct. App. 1992).

Currently, only two States, Mississippi and Nebraska, completely ban all forms of juror questioning. See *Wharton* v. *State*, 734 So. 2d 985 (Miss. 1998); *State* v. *Zima*, 237 Neb. 952 (1991). In Georgia, the prohibition on juror questioning applies only to direct questioning. See *Matchett* v. *State*, *supra* ("[D]irect questions from a juror to a witness are generally not permitted in this state"). Finally, Texas bars juror questioning only in criminal cases. See *Hudson* v. *Markum, supra* (noting that *Morrison* v. *State*, 845 S.W.2d 882, 889 (Tex. Ct. App. 1992), is not binding in civil cases and that "[t]here is nothing improper about the practice" in civil cases), quoting *Fazzino* v. *Guido*, 836 S.W.2d 271, 276 (Tex. App. 1992).

judge's response was entirely appropriate and it averted any error.

Finally, the defendant claims that one juror whose question referred to him as "the gunman" had predetermined that he was guilty. We disagree. The reference was mere artlessness. At the request of counsel, the judge substituted the term "defendant" for every reference to the term "gunman" in the submitted question such that the question put to the witness was devoid of any reference equating the "gunman" with the defendant. The defendant also argues, for the first time on appeal, that the judge erred by failing to instruct the jury that they should refrain from referring to the defendant as the gunman in their questions. If the judge had given the instruction that appellate counsel suggests, the purpose would have been self-defeating. The judge would have spread what the defendant claims was potential prejudice to the rest of the jurors. Instead, his method of handling the matter was self-curative: only the juror whose question was sanitized likely would have noticed what the judge did. Finally, the judge instructed the jury that they must not decide the case until after they had heard all the evidence. Because jurors are presumed to follow instructions, there was no error. *Commonwealth v. Pope*, 406 Mass. 581, 588 (1990).

At one point, the judge posed a juror's question to a witness after trying to explain the juror questioning process to the witness. The witness expressed befuddlement, and the judge then said: "Just tell the truth." The defendant claims, without offering any reason, that this was prejudicial. We do not agree. The judge merely reminded the witness of his duty to tell the truth. There was no error.

This case nevertheless illustrates some of the difficulties that can arise when questions are solicited from jurors.[7] We have expressed concern that "allowing jurors to question witnesses

---

[7]On review of the record, more than a hint of regret is detected in the judge's decision to permit unlimited questioning. The questions became so numerous that at one point the judge requested jurors to refrain from asking so many questions. When this tactic proved of no avail, the judge informed the jury that he no longer would put their questions to witnesses, but instead would pass their questions to the lawyers who could, if they deemed appropriate, ask the questions. Although there has been no showing that this "midstream" change of direction resulted in any prejudice, see *People v. Cum-*

has the potential for introducing prejudice, delay, and error into the trial." *Commonwealth* v. *Urena, supra* at 701. There has been no showing that this trial was so affected. Based on the record presented and the demonstrated benefits of the juror questioning procedure in general, we see no reason at this juncture to conclude that juror questioning is impermissible. Instead, this case provides the opportunity to clarify and offer suggestions for juror questioning in future trials.

It bears emphasizing that the decision to allow juror questioning and the manner of questioning rests in the sound discretion of the trial judge. It need not be limited to any particular type of case. The judge may permit questioning over the objection of all parties. We continue, however, to encourage judges to consult the parties on the matter, preferably before trial. See *Commonwealth* v. *Urena, supra.*

We adhere to the other procedures recommended in *Commonwealth* v. *Urena, supra* at 702-703, which we now review, with some modifications based on the growing experience with the practice in this and other jurisdictions. (1) "[T]he judge should instruct [the jury] . . . that they will be given the opportunity to pose questions to witnesses." We suggest that the jury also be instructed not to let themselves become aligned with any party, and that their questions should not be directed at helping or responding to any party. Rather, they must remain neutral and impartial, and not assume the role of investigator or of advocate. (2) Jurors' questions need not be limited to "important matters," as we stated in *Urena*, but may also seek clarification of a witness's testimony. Reining in excessive questioning may present the greatest challenge to a judge, as occurred in the instant case. (3) The judge should "emphasize[] to jurors that, although they are not expected to understand the technical rules of evidence, their questions must comply with those rules, and so the judge may have to alter or to refuse a particular question." (4) "The judge further should emphasize that, if a particular question is altered or refused, the juror who poses the question must not be offended or hold that against

*mings*, 4 Cal. 4th 1233 (1993), cert. denied sub nom. *Gay* v. *California*, 511 U.S. 1046, it demonstrates the effect the procedure can have on trial management.

either party." (5) "[I]t is important that the jurors are told that they should not give the answers to their own questions a disproportionate weight." We suggest that the judge also instruct jurors not to discuss the questions among themselves but, rather each juror must decide independently any questions he or she may have for a witness.[8] (6) "These instructions should be repeated during the final charge to the jury before they begin deliberations." *Id.* (7) All questions should be submitted in writing to the judge.[9] We suggest that the juror's identification number be included on each question.[10] This will enable the judge to address problems unique to a juror, as by voir dire, or to give a curative instruction without exposing the entire jury to any potential prejudice. (8) On submission of questions, counsel should have an opportunity, outside the hearing of the jury, to examine the questions with the judge, make any suggestions, or register objections. This may be done at sidebar, or the jury may be removed at the judge's discretion. The judge should rule on any objections at this time, including any objection that the question touches on a matter that counsel purposefully avoided as a matter of litigation strategy, and that, if asked, will cause particular prejudice to the party. (9) Finally, counsel should be given the opportunity to reexamine a witness after juror interrogation. See *DeBenedetto* v. *Goodyear Tire & Rubber Co.*, 754 F.2d 512, 515 n.1 (4th Cir. 1985); *Rudolph* v. *Iowa Methodist Med. Ctr.*, 293 N.W.2d 550, 556 (Iowa 1980). The scope of the examination should ordinarily be limited to the subject matter raised by the juror question and the witness's answer. See *id.* The purpose of reexamination is two fold. First, it cures the admission of any prejudicial questions or answers; and second, it prevents the jury from becoming adversary in its interrogation.

---

[8]See Ariz. R. Crim. P. 18.6(e) & comment (2001).

[9]The majority of States that permit juror questioning require or at least favor written, as opposed to direct questioning. See Comment, Juror Questions: A Survey of Theory and Use, 55 Mo. L. Rev. 817, 852-860, 869 (1990) (comparing States which permit oral questions with those which permit written questions, and advocating that judges should actively screen all questions).

[10]We acknowledge that other jurisdictions have concluded differently. See, e.g., *Yeager* v. *Green*, 502 A.2d 980, 982 (D.C. 1985) (juror identity, including seat number, should be concealed to prevent embarrassment or alienation).

The new procedures we recommend are prospective in application only. Failure to follow any of the recommended *Urena* procedures, as modified, will not result in reversal absent a showing of prejudice. See *Commonwealth* v. *Urena, supra* at 699-700.

5. *The underlying armed robbery conviction.* The defendant, joined by the Commonwealth, asks us to vacate his conviction of armed robbery while masked because it was the underlying felony serving as the basis for the felony-murder conviction. We are satisfied that evidence of the armed robbery served as a basis for the conviction of that offense as well as the felony-murder conviction, and that the former must be vacated. See *Commonwealth* v. *Gunter*, 427 Mass. 259, 264 (1998), citing *Commonwealth* v. *Jones*, 382 Mass. 387, 395 (1981).

6. *Relief pursuant to G. L. c. 278, § 33E.*[11] We have reviewed the entire record, the briefs, and the arguments, and see no reason to reduce the degree of guilt or order a new trial. The conviction of armed robbery while masked is vacated. The remaining convictions are affirmed.

*So ordered.*

COWIN, J. (concurring). I concur but I do not endorse the practice of juror questioning in criminal cases absent a comprehensive review of the use of this procedure. The court today has moved significantly from our position in *Commonwealth* v. *Urena*, 417 Mass. 682 (1994), that juror questioning of witnesses "should be utilized infrequently and with great caution . . . limited to cases where, in the opinion of the trial judge, it is particularly appropriate." *Id.* at 701-702. Now the court holds that juror questioning "need not be limited to any particular type of case." *Ante* at 613. With no systematic evaluation by the Legislature or within the court system, we have

---

[11]We acknowledge receipt of a postargument letter by appellate counsel requesting § 33E review because no specific request was made in the defendant's brief or at oral argument. Nevertheless, it is our duty to review the entire record pursuant to G. L. c. 278, § 33E, even absent a request by the defendant that we do so. See *Commonwealth* v. *Goudreau*, 422 Mass. 731, 734 (1996).

just moved from permitting this type of experimentation in a narrow range of cases to general adoption of the process. There is no foundation for so doing. I believe that the practice of juror questioning is best addressed either by the Legislature or by the adoption of rules by the court after an in-depth consideration of the entire subject matter.