JANICE KELLY, individually and as executrix,[1] *vs.* FOXBORO
REALTY ASSOCIATES, LLC, & another[2]
(and a companion case[3]).

Suffolk. May 4, 2009. - July 16, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Jury and Jurors. Practice, Civil,* Instructions to jury. *Agency,* Independent
contractor. *Negligence,* Employer, Independent contractor.

At a civil trial, the judge erred in instructing the jury that they could discuss
evidence among themselves during the course of the trial, without the
agreement of the parties; however, the error was harmless, where the judge
gave repeated, forceful instructions limiting the type of discussions in
which the jurors permissibly could engage during the trial and, at the close
of the evidence, instructed the jurors to end any predeliberation discus-
sions; where there was no support for the claim that jurors prematurely
deliberated critical issues; where the stipulated and uncontested evidence
against the defendants was powerful, which suggested that even without
the contested instruction, the jury's verdict would not have been different;
and where the jury never actually requested time to discuss the evidence in
the manner permitted by the judge. [310-315]
At the trial of a civil complaint alleging negligence, the judge did not abuse
his discretion in instructing the jury on the control necessary for an employer
to be held liable for the negligence of its independent contractor. [315-317]

CIVIL ACTION commenced in the Superior Court Department on
May 5, 2004.

CIVIL ACTION commenced in the Stoughton Division of the
District Court Department on August 25, 2006.

After transfer and consolidation, the cases were tried before
*Raymond J. Brassard,* J.

The Supreme Judicial Court granted an application for direct
appellate review.

[1]Of the estate of Thomas Kelly.
[2]Apollo Security, Inc. (Apollo).
[3]Robert Dixon *vs.* Foxboro Realty Associates, LLC (Foxboro), & another. A
third consolidated case is not part of this appeal.

*Myles W. McDonough* for Foxboro Realty Associates, LLC.

*John A.K. Grunert* for Apollo Security, Inc.

*Andrew C. Meyer, Jr.* (*Adam R. Satin* with him) for Janice Kelly.

CORDY, J. In this personal injury case we must decide whether it was permissible for a judge to instruct jurors that they could discuss evidence among themselves during the course of the trial, without the agreement of all parties. We do not indorse the practice except in civil trials where all parties agree, but conclude that the defendants suffered no prejudice in this case from the judge's decision to allow the jury to do so. We also must decide whether the judge correctly instructed the jury on the "control" an employer must exercise over an independent contractor to be liable for the contractor's negligence. We conclude that the judge's instruction on "control" was proper. We affirm judgment for the plaintiffs.

1. *Facts.* This case arises from tragic events on August 29, 2003. Based on the evidence, the jury could have found the following.

Early in the afternoon, a bus carried passengers from a golf tournament in Norton to Gillette Stadium in Foxborough, where the passengers previously had parked their vehicles. As the bus traveled down an access road owned by the defendant Foxboro Realty Associates, LLC (Foxboro), a large security gate arm swung into the road, piercing the side of the bus. A number of passengers suffered serious injuries; one passenger, Thomas Kelly, later died from his injuries.[4] Foxboro owned the property on which the accident occurred, Apollo Security, Inc. (Apollo), provided security guards for the stadium parking lots and surrounding areas, and Standard Parking Corporation (Standard) managed stadium parking operations.

On the second day of what was to be a two and one-half week trial, the judge instructed the jurors that they would be permitted to discuss the evidence among themselves throughout

---

[4]Thomas Kelly's wife, Janice Kelly, filed this lawsuit individually and as executrix of his estate against Foxboro; Apollo; Standard Parking Corporation (Standard); Rebecca Valentin, the bus driver; and Arrow Line Acquisition, LLC (Arrow), the bus owner and operator. Another passenger who was injured, Robert Dixon, also filed suit. The jury eventually returned verdicts in favor of Valentin and Arrow.

the course of the trial.[5] The instruction directed, however, that
they could exercise this option only when they were together as
a group,[6] and cautioned that they could not "judge" the evi-
dence midtrial.[7] The defendants' objection was overruled.

During the trial, the parties first focused on the condition of
the security gate at the time of the accident. The defendants
conceded that the gate arm was normally secured in the "open"
position by dropping a three-pound pin through a hole in the gate
pole and a sleeve in a post on the side of the road. If the pin was
twisted, a flange would lock into place, preventing the pin from
being lifted out of the sleeve. At the time of the accident, the pin
was found in an unsecured, raised position; witnesses were unsure
when it had been placed in that position or who had placed it
there. There was evidence of strong wind gusts on the day of the
accident, and the plaintiffs' expert opined that the wind blew the
unsecured gate arm into the bus.

Next, the parties offered evidence with respect to who was
responsible for safely securing the gate. It was uncontested that

[5]"From this point forward in the trial, you may, if you wish, as a jury, talk
about the case in a certain way amongst each other, only amongst each other
as a jury. . . . [E]xperience has shown that, in a long case and in a case with
many witnesses and of some complexity, that it may be useful in some respects
for the jurors to talk about the evidence in a limited way with one another
during the trial. For example, if you misunderstood something, it may be bet-
ter to get it corrected at the beginning of the trial rather than to wait two
weeks or so and have been thinking, under the mistaken impression, that
something was so when it was not. It may also help you to better remember
and understand the testimony. But that's up to you. This is not obligatory; it's
an option that you, as a jury, have."

[6]"However, there are some important ground rules. Number [one], when
you talk about the case, you may only do so when all of you are together and,
of course, when no one else is present. We don't have any subcommittees on
the jury. It's only when all of you are together. You may do it as you are wait-
ing to get started in the morning if we are detained here in the court room.
You may do it at the break if you wish. You may stay over a bit at lunch or
what have you and do it then, or at the end of the day. Or you may not do so
at all. It's up to you. But everyone has to be together."

[7]"[I]t would be very unfair, and indeed it's not allowed, for you to begin
judging the evidence. You cannot even judge, ladies and gentlemen, the
believability of one witness fairly until you've heard all of the witnesses. . . .
In other words, you can talk about the evidence with a view to better understand-
ing the evidence, not with a view to judging it, evaluating it. Judgment and
evaluation must come at the very end of the case. You can talk about it with a
view to understanding it better."

Foxboro hired Standard, an independent contractor, to run stadium parking operations for New England Patriots football games, soccer games, and other events; and that Foxboro hired Apollo, also an independent contractor, to handle security operations on the day of the accident. Foxboro and Apollo employees testified that prior to a stadium event, the ten to fifteen security gates would be in the "closed" position, each secured by a padlock. Apollo employees would then unlock the padlocks, but leave the gate arms in the closed position with the unlocked padlocks loosely holding the gate arms together. At a specific time, Standard employees would then remove all the padlocks, open the gates, and begin directing traffic into the parking lots. Foxboro stipulated that it "established the protocol for how the gate was to be opened and how the gate was to be secured in the open position." However, witnesses testified that protocols relating to gate arm safety were never put into writing, and they were unsure whether Foxboro had explained the protocols to Standard or Apollo. The plaintiffs essentially argued that Standard and Apollo were responsible for opening and maintaining the gates in a safe "open" position, and that Foxboro was liable for their negligent performance of that responsibility because of its "control" over Standard's or Apollo's operation of the gate.[8]

The jury found Foxboro, Apollo, and Standard liable for Thomas Kelly's pain and suffering prior to his death and for the Kelly family's loss of consortium, and awarded $4,400,000 in damages.[9] Foxboro and Apollo appealed, and we granted Foxboro's application for direct appellate review, which Apollo had joined.

2. *Discussion.* On appeal, the defendants argue that the judge improperly (1) instructed the jury that during the trial they could discuss evidence as a group, and (2) failed to instruct the jury that Foxboro could be liable for its contractors' negligence

[8]The plaintiffs also argued that Foxboro was liable because it should have provided additional padlocks to lock the pins into a secure position in the sleeve, and because Foxboro provided inadequate training to Standard and Apollo on gate safety.

[9]The jury also awarded $45,000 to Robert Dixon in compensation for his injuries. With prejudgment interest, the court entered final judgments of $6,119,727.35 to Janice Kelly and $52,352.88 to Dixon.

only if it exercised a "degree of control" over the contractors' work.

a. *Instruction allowing a jury to discuss evidence during the trial.* When reviewing jury instructions to which there has been an objection, we conduct a two-part test: "whether the instructions were legally erroneous, and (if so) whether that error was prejudicial." *Masingill* v. *EMC Corp.*, 449 Mass. 532, 540 n.20 (2007), citing *Blackstone* v. *Cashman*, 448 Mass. 255, 270 (2007). This is also the standard for reviewing the use of an "innovative" jury technique over a party's contemporaneous objection. See *United States* v. *Lewis*, 716 F.2d 16, 19 (D.C. Cir.), cert. denied sub nom. *Motlagh* v. *United States*, 464 U.S. 996 (1983) (standard on appeal from conviction by "dual jury" is "whether there exists evidence indicating that the dual jury caused specific prejudice to someone's defense at trial"). Cf. *Commonwealth* v. *Britto*, 433 Mass. 596, 611 (2001) ("defendant has the burden of showing actual prejudice from juror questions").

As to the first part of the test, the defendants argue that the instructions were legally erroneous under *Commonwealth* v. *Benjamin*, 369 Mass. 770, 772 & n.2 (1976) (*Benjamin*). In that case, the court specifically "disapprove[d]" the judge's instructions, given to the jury on the first day of trial, that they were "free to discuss the case in the jury room among themselves and that a married juror could tell his or her spouse what the juror had heard." *Id.* at 771-772.[10] The court further noted that where there had been no objection to the instruction by trial counsel, the issue was waived, and because there was no showing of prejudice by the defendant, the court would not consider the matter further under G. L. c. 278, § 33E. However, the court took the opportunity to direct trial judges to use "[a]n appropriate instruction for such occasions" which pointedly included an admonition that "[u]ntil this case is submitted to you, you must not discuss it with anyone, even with your fellow jurors." *Id.* at 772.[11]

---

[10]The trial judge in *Commonwealth* v. *Benjamin*, 369 Mass. 770, 772 (1976) (*Benjamin*), also instructed the jurors that in those discussions the jurors were not to "express any opinions."

[11]"Until this case is submitted to you, you must not discuss it with anyone, even with your fellow jurors. After it is submitted to you, you must discuss it

We have not had occasion to consider again the propriety of giving a variant of the type of instruction that we explicitly disapproved in *Benjamin.*[12] Since that case was decided, however, several States (including Massachusetts) have conducted studies to determine whether certain innovative jury practices would improve the quality of jury deliberation. See, e.g., Diamond, Juror Discussions During Civil Trials: Studying an Arizona Innovation, 45 Ariz. L. Rev. 1, 16-17, 22-32 (2003); Lakamp, Deliberating Juror Predeliberation Discussions: Should California Follow the Arizona Model, 45 U.C.L.A. L. Rev. 845, 850 (1998); Massachusetts Project on Innovative Jury Trial Practices Final Report, National Center for Citizen Participation in the Admin. of Justice at 55-56 (2001) (Massachusetts Report). The Massachusetts study analyzed a wide range of innovative techniques (sixteen in all) during the course of 150 actual trials, including allowing jurors to suggest questions for witnesses, placing time limits on attorneys, giving jurors notebooks to enable them to take notes during the trial, providing jurors with written or recorded instructions, and allowing the jury to discuss evidence as it is entered. *Id.* at 48, 51, 54. Some of these techniques are minimally intrusive, and others (including the one at issue here) change more fundamentally the jury's deliberative process, as we have traditionally administered it.[13]

---

only in the jury room with your fellow jurors. It is important that you keep an open mind and not decide any issue in the case until the entire case has been submitted to you under instructions of the court." *Benjamin, supra* at 772, quoting 1 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 10.01 (2d ed. 1970). We also said in *Benjamin, supra:*

> "We recognize that it is hard for a juror to obey such instructions, particularly in talking to a spouse, and it can be argued that they are largely unenforceable. But they are sound; if followed, they avoid a variety of troubles. In particular, we do not think it is useful to ask lay jurors to distinguish in conversation between opinion and fact."

[12]There are a number of important differences between the *Benjamin* case and this case, not the least of which is that *Benjamin* was a criminal case and this is a civil case. In addition, the instructions were different in several respects. For example, in *Benjamin, supra* at 772, the jurors were instructed that they were allowed to discuss the case with their spouses, and were not specifically instructed that they needed to be all together to have any discussions among themselves.

[13]Scholarly responses to these studies vary widely. Contrast Diamond, Jury

Twenty-four judges, including the trial judge in this case, participated in the Massachusetts study.[14] During the study, only one of the judges employed the innovation at issue here —instructing juries that they were permitted to engage in discussions during trial — and did so in only six civil trials. The parties in those trials all agreed to the instruction, and before employing the practice in those trials, the judge sought and received permission from a single justice of this court. While some of the innovative techniques used in the study have gained a measure of acceptance in Massachusetts and elsewhere,[15] this one remains controversial.[16]

Massachusetts judges enjoy discretion in using the innovations included in the project, except where the court has specifically disapproved of the proposed innovation. While the judge's instructions to the jury in this case differed from the judge's instructions in *Benjamin*, and were less objectionable, they still violated our directive in *Benjamin* not to permit jurors to discuss the case with each other before they commenced deliberations.

Room Ruminations on Forbidden Topics, 87 Va. L. Rev. 1857, 1874 (2001) (except for brief detours into impermissible areas, jury discussions are largely proper), with Hannaford-Agor, "Speaking Rights": Evaluating Juror Discussions During Civil Trials, 85 Judicature 1, 2-3 (2002) (allowing midtrial jury to discuss evidence as group increases occurrence of impermissible discussions in small groups and with nonjurors). While we decline to evaluate the statistical methodology or conclusions reached in these studies, it is clear that they have not established decisively that these jury techniques are beneficial or detrimental to the outcomes.

[14]The Massachusetts Project on Innovative Jury Trial Practices Final Report, National Center for Citizen Participation in the Admin. of Justice at 55-56 (2001) (Massachusetts Report), was undertaken with the assent of the Supreme Judicial Court, and data with respect to the trials at which the various techniques were used was collected by the Supreme Judicial Court.

[15]For example, a majority of States (including Massachusetts) and the District of Columbia permit jurors to ask questions, subject to the discretion of the judge. See *Commonwealth* v. *Britto*, 433 Mass. 596, 610-611 & n.6 (2001).

[16]See Lakamp, Deliberating Juror Predeliberation Discussions: Should California Follow the Arizona Model?, 45 U.C.L.A. L. Rev. 845, 855-857 (1998) (jurors frequently engage in intratrial discussions against instructions, and so judges should "creat[e] specific guidelines regarding predeliberation discussions"); Diamond, Juror Discussions During Civil Trials: Studying an Arizona Innovation, 45 Ariz. L. Rev. 1, 51 (2003) (when jurors are given permission to discuss case midtrial, they are much more likely improperly to discuss what verdict should be prior to deliberation).

That directive remains unchanged, except as to civil trials with the agreement of all parties. See note 17, *infra.* Without further study, we are not prepared to indorse a different approach to this issue, which reasonable practitioners and judges conclude may affect the ability of members of a jury to keep an open mind until the entire case has been submitted for their consideration under instructions from the court. See *Benjamin, supra* at 772 (midtrial jury discussions may cause "a variety of troubles"). See also *Winebrenner* v. *United States*, 147 F.2d 322, 328 (8th Cir.), cert. denied, 325 U.S. 863 (1945) ("what one himself publicly declares touching any controversy is much more potent in biasing his judgment and confirming his predilections than similar declarations which he may hear uttered by other persons"); *State* v. *Washington*, 182 Conn. 419, 428 (1980) ("distinction between discussion and deliberation is more apparent than real"); *Commonwealth* v. *Kerpan*, 508 Pa. 418, 422 (1985) (once jurors state opinions aloud, they may be less willing to change their minds). It was error for the judge to have proceeded in this fashion, without the consent of all parties.[17],[18]

We proceed then to the second part of the test: whether the judge's instruction prejudiced the defendants. Under the well-established standard, the court must determine whether the "result might have differed absent the error." *Blackstone* v. *Cashman*, 448 Mass. 255, 270 (2007). We are convinced that it would not.

First, the judge gave repeated, forceful instructions limiting the type of discussions in which the jurors permissibly could engage during the trial.[19] These instructions directly countered

---

[17]While the parties in a civil case may consent to juror discussions during the trial, we would not approve of that practice in a criminal case.

[18]Our ruling in this case is not intended to discourage other innovative trial approaches that may improve jurors' understanding of the evidence and reduce confusion.

[19]"Now, make sure . . . that you're all together and that you don't cross the line of evaluating or judging the evidence. It's well for me to appoint a foreperson for the jury now so that someone is responsible to be sure you don't cross over this boundary . . . ." "If you are discussing the case as a jury, please, following carefully the two primary rules, only when you are together and only when you're being careful not to judge or evaluate, but only better to understand the evidence." "I want to remind you that if you are talking about the evidence, remember only when you're all together and only being careful not to judge, not to evaluate, but only to understand." "If you are

the defendants' primary concern that the jurors would "prematurely deliberate[] critical issues, even before the defense had begun its case." Additionally, at the close of the evidence the judge instructed jurors to end any predeliberation discussions; this helped confine the jury's discussions to evidentiary issues only. "We presume that the jury followed the judge's instruction." *Commonwealth* v. *Pillai*, 445 Mass. 175, 190 (2005).

Second, we reject the defendants' claim that questions (for witnesses) proposed by some of the jurors during the trial demonstrate that the jurors "prematurely deliberated critical issues." Questions highlighted by the defendants are requests only for additional facts,[20] an expert opinion,[21] or a response to a particular piece of evidence.[22] The questions do not demonstrate that the jury had engaged in any preliminary deliberation, and they certainly do not show the preliminary *group* deliberation that the defendants posit. See *Commonwealth* v. *Urena*, 417 Mass. 692, 700 (1994) (even if one juror's suggested question showed improper midtrial deliberation, it did not "support the assertion that other jurors were influenced improperly and prematurely").

Third, in this case much of the evidence was uncontested. Apollo, Standard, and Foxboro agreed that the gate created an unsafe condition when it swung open; that it caused Kelly's death; that the arm was usually secured by a three-pound pin; that the pin was found in an unsecured position after the accident; that Apollo and Standard were responsible for interacting with the gate on the day of an event; that Foxboro had the right to control the gate arm; that Foxboro had created a safety protocol regarding the gates; and that the safety protocol had never been reduced to writing. The stipulated and uncontested evidence against the three defendants was powerful, and, even without the

talking about the evidence, remember only with a view to understanding it, not judging it or evaluating it please."

[20] "Where was the padlock that was supposed to be used to hold the gate open? Should there not be two locks used to secure both sides?" "Who was responsible to meet w/ Apollo about how to open gates and park cars from Standard Parking?"

[21] "In [the plaintiffs' expert's] opinion, are the contract between [Foxboro], Apollo Security, and Standard Parking proper to secure traffic safety?"

[22] "Can the witness explain why he is not alarmed that operational practices that impact public safety are not written down?"

contested instruction, we are persuaded that the jury's verdict would not have been different. *Blackstone* v. *Cashman, supra* at 270.

Finally, the jury never actually requested time to discuss the evidence in the manner permitted by the judge.[23] The jury may not have exercised their power to discuss evidence at all; at the very least, they spent little time doing so.

b. *"Control" instruction.* Foxboro argues that the judge improperly instructed the jury on the "control" necessary for an employer to be held liable for the negligence of its independent contractor. Employers are typically not liable for the negligence of their independent contractors unless they have "retained some control over the manner in which the work was performed." *Herbert A. Sullivan, Inc.* v. *Utica Mut. Ins. Co.,* 439 Mass. 387, 407 (2003), citing *Lyon* v. *Morphew,* 424 Mass. 828, 834 (1997). Foxboro requested that the judge instruct the jury using language from Restatement (Second) of Torts § 414 comment c (1965).[24] Instead, the judge gave an instruction with language from *Corsetti* v. *Stone Co.,* 396 Mass. 1, 9-10 (1985).[25] Foxboro argues that the

---

[23]"You may stay over a bit at lunch or what have you and do it then, or at the end of the day. Or you may not do so at all."

[24]The instruction requested was: "In order for the rule to apply, *the employer,* in this case Foxboro, *must have retained at least some degree of control over the manner in which the work is done by the independent contractors.* It is not enough that it has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. *There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."* (Emphases added.)

[25]"So far as *the employer in fact gives direction for the work, furnishes equipment for the work, or retains control over any part of the work,* then, if any of those applies, the employer itself is required to exercise reasonable care for the protection of others. On the other hand, if the employer retains no control over the manner in which the work is to be done, the work is to be regarded as the independent contractor's own enterprise . . . . However, if the employer retains the right to control the work, in any of its aspects including the right to initiate and maintain safety measures and programs, then the employer, as well, . . . may be liable for damages caused by its failure to do so. In other words, *one who entrusts work to an independent contractor, but who retains control over any part of the work, is subject to liability . . . ."* (Emphases added.)

judge erroneously instructed the jury that the issue was only
" 'control' versus 'no control,' " and that the judge should have
stated that Foxboro must have had a sufficient "degree of con-
trol necessary for liability."

"A trial judge has wide latitude in framing the language to be
used in jury instructions" as long as the instructions adequately
explain the applicable law. *Jacobs* v. *Pine Manor College*, 399
Mass. 411, 414 (1987). "The judge [is] not bound to instruct in
the exact language of the requests"; "[t]he test of the charge is
the impression created by it as a whole." *Commonwealth* v.
*Kelley*, 359 Mass. 77, 92 (1971). In this case, the charge as a
whole constituted a proper instruction on the applicable law.
The judge correctly stated that an employer can be held liable
for an independent contractor's negligence only if the employer
"gives direction for the work, furnishes equipment for the work,
or *retains control over any part of the work*" (emphasis added).
He also stated that "one who entrusts work to an independent
contractor, but who *retains control over any part of the work*, is
subject to liability" (emphasis added). These instructions were
almost identical to our rule: "One who entrusts work to an in-
dependent contractor, but who *retains the control of any part of
the work*, is subject to liability for physical harm to others for
whose safety the employer owes a duty to exercise reasonable
care, which is caused by his failure to exercise his control with
reasonable care" (emphasis added). Restatement (Second) Torts,
*supra* at § 414. See *Corsetti* v. *Stone Co.*, *supra*; *Dilaveris* v.
*W.T. Rich Co.*, 424 Mass. 9, 11-12 (1996).

We agree that in some cases it might be helpful to instruct
juries that "[t]here must be such a retention of a right of supervi-
sion that the contractor is not entirely free to do the work in his
own way." *St. Germaine* v. *Pendergast*, 411 Mass. 615, 622-623
& n.11 (1992), quoting Restatement (Second) of Torts, *supra* at
§ 414 comment c, and citing *Foley* v. *Rust Int'l*, 901 F.2d 183,
184 (1st Cir. 1990). That type of instruction would be particu-
larly important where the facts could support a conclusion that
the employer possessed only "a general right to order the work
stopped," which is insufficient for liability to be imposed. *Lyon*
v. *Morphew*, 424 Mass. 828, 835 (1997), quoting Restatement
(Second) of Torts, *supra*. In this case, however, Foxboro

stipulated that it "established the protocol for how the gate was to be opened and how the gate was to be secured in the open position." This was more than a mere "general right" to control the gate arm; as a result, while the judge could have added the language from § 414 comment c, it was not necessary in this case. The language proposed by the defendant is "more beneficial to the [defendants] than the evidence warranted." *St. Germaine* v. *Pendergast, supra* at 623. The instruction was legally accurate, and the precise wording of the charge was not an abuse of discretion. *Jacobs* v. *Pine Manor College, supra.*[26]

The judgments in favor of the plaintiffs are affirmed on all counts.

*So ordered.*

---

[26]Although we need not reach the issue, we also note that Foxboro was not prejudiced by the instruction. *Masingill* v. *EMC Corp.*, 449 Mass. 532, 540 n.20 (2007). There was ample evidence supporting the jury's conclusion that Foxboro retained sufficient control over its independent contractors for liability to be imposed. See *Corsetti* v. *Stone Co.*, 396 Mass. 1, 11 (1985) (whether control over contractor sufficient to impose liability is question of fact for jury). At trial, Foxboro conceded by stipulation that it owned the gate; that it "had control over the gate and the padlocks used to secure the gate"; that it "had the power and the authority to direct the manner in which the gate would be secured in the open position"; and that it "established the protocol for how the gate was to be opened and how the gate was to be secured in the open position."