## Commonwealth *vs.* Porforio Morales.

Hampden. December 5, 2008. - January 9, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, & Cordy, JJ.

*Practice, Criminal,* New trial, Assistance of counsel, Jury and jurors, Instructions to jury, Reciprocal discovery, Indictment, Argument by prosecutor, Capital case. *Constitutional Law,* Assistance of counsel. *Evidence,* Alibi, Cumulative evidence, Intoxication, Failure to produce witness, Indictment. *Witness,* Impeachment.

A criminal defendant seeking a new trial after convictions of murder and assault failed to demonstrate that his trial counsel rendered ineffective assistance by failing to present alibi witnesses, where counsel's decision was a strategic one, and not manifestly unreasonable, given the witnesses' obvious bias and weak testimony, and counsel's coherent, well-integrated, and plausible defense strategy [43-46]; further, the record did not support the defendant's contention that trial counsel failed to bring a sleeping juror to the attention of the trial judge [47].

A criminal defendant seeking a new trial failed to demonstrate that his trial counsel was ineffective by failing to pursue the issue of the defendant's voluntary intoxication, an issue that was inconsistent with counsel's defense strategy and not supported by the evidence [47-48]; further, counsel's tactical decision not to call a certain impeachment witness was not manifestly unreasonable [48-49].

A criminal defendant could not maintain a claim of ineffective assistance of trial counsel based on counsel's alleged failure to preserve properly for appellate review the issue of an alleged error in a reciprocal discovery order, where no such error existed. [49-51]

There was no merit to a criminal defendant's claim that his first appellate counsel was ineffective for failing to raise certain claims in the defendant's first motion for a new trial. [51]

A trial court judge did not abuse his discretion in declining to give a missing witness instruction requested by the defendant, where the missing witness's expected testimony would have added nothing of significance to the Commonwealth's case. [51-52]

The form of a criminal indictment charging the defendant with murder in the first degree was sufficient. [52]

Impropriety, if any, arising from a statement in a prosecutor's closing argument at a criminal trial was cured by the judge's instructions to the jury. [52-53]

Indictments found and returned in the Superior Court Department on December 20, 2004.

The cases were tried before *Daniel A. Ford*, J., and motions for a new trial, filed on December 8, 2006, and November 2, 2007, were considered by him.

*Stephen Neyman* for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of the deliberately premeditated murder of Daylan Shepard, the assault by means of a dangerous weapon of Travis Brown, the armed assault with intent to murder Travis Brown, and unlawful possession of a firearm. Represented by first appellate counsel, he filed a motion for a new trial, alleging ineffective assistance of counsel, which was denied. Represented by second (present) appellate counsel, he filed a second motion for a new trial, alleging ineffective assistance of counsel, which also was denied. He appealed from the denial of each motion for a new trial, and those appeals have been consolidated with his direct appeal, which alleges error in the failure to give a missing witness instruction, error in the form of the indictment, and improprieties in the prosecutor's closing argument. We now affirm the convictions and the denial of both motions for a new trial, and we decline to exercise our authority under G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following facts. On July 4, 2004, Patrick Bullard was shot and killed. He was a member of the Eastern Avenue gang in Springfield. Tameka Patterson, a daughter of the defendant's girl friend, Sheila Brady, was shot in the face during the same incident. A friend of Patterson recognized the shooters as members of a rival gang known as the Gunn Square gang. Patterson, her mother, and the defendant lived together, and the defendant talked of seeking revenge for Patterson's shooting.

On the evening of July 10, 2004, Marquis Nixon was at the home of the defendant and Sheila Brady. While outside on the porch, the defendant asked Nixon for a ride to a store. Nixon, who had plans to go to a party, reluctantly agreed after the defendant said it would be "quick." The defendant went inside, obtained a gun, and placed it in his waistband. Leo White, who was in the house, saw this and followed the defendant outside. The three men entered Nixon's car. Nixon drove, the defendant sat in the

front passenger seat, and White sat behind the defendant. They proceeded toward Gunn Square, near the corner of Northampton Avenue and Beverly Street. The defendant told Nixon to pull over, park past the corner of Northampton Avenue and Beverly Street, and turn off his headlights. He left the engine running. The defendant and White got out of the car and walked toward a store at the corner of Beverly Street and Wilbraham Avenue.

In the meantime, nineteen year old Daylan Shepard and seventeen year old Travis Brown had been visiting a friend at his home on Massachusetts Avenue in Springfield. At approximately 11 P.M. Shepard and Brown walked to the same store at the corner of Beverly Street and Wilbraham Avenue where the defendant and White were headed. After buying some snacks they began to walk back. Brown saw two men standing at the far end of Beverly Street, but he could not make out their features because it was too dark. The two men he saw were the defendant and Leo White. When the defendant saw the two boys emerge from the corner store, he asked White if they were "the kids that shot" Bullard and Tameka Patterson the week before. White could not identify the two boys, and so told the defendant. The defendant nevertheless pulled out his gun and started shooting at the boys, who were at least twenty feet away.

Brown saw a flash and heard a shot coming from the direction of the two men. He and Shepard turned and ran. Brown then heard about six more shots. As they ran through some backyards Shepard said he had been shot. He collapsed behind a house on Northampton Avenue. Brown knocked on the back door of the house to try to get help, but no one answered. He then ran back to his friend's house and telephoned 911. Brown returned to the scene, where he saw Shepard being placed in an ambulance. Shepard died from a single gunshot wound to his left lower back.

Meanwhile White and the defendant had run back to the car where Nixon was waiting. Nixon had heard the shots. When the defendant was inside the car, he said, "We got 'em." Nixon asked, "Who?" White replied, "The people that shot Pat." Nixon drove the two men back to the defendant's house.

Police recovered nine spent shell casings in front of 7 and 9 Beverly Street, about sixty feet from its intersection with Wilbraham Avenue. The casings were all within about two and one-

half feet of each other. Several projectiles were recovered from inside a building on Wilbraham Avenue, across from Beverly Street and the corner store. A projectile was found in a truck parked in front of the corner store, and projectile fragments were found in front of the store. In mid-July the defendant sold a nine millimeter semiautomatic handgun to George Lovejoy. Lovejoy's cousin, Bridget Morris, was present during the sale. She kept the gun at her house in Springfield, and turned it over to Springfield police on October 27, 2004.

A State police ballistics expert determined that all the recovered shell casings had been fired by the nine millimeter handgun recovered from Morris. He further determined that four spent projectiles that had been recovered were intact and could be compared to a projectile test-fired from the nine millimeter handgun. One was found outside the building on Wilbraham Avenue; one was found inside the same building; one was inside the truck parked in front of the corner store; and the fourth was recovered from Shepard's body at autopsy. The ballistician determined that all four projectiles had been fired from the nine millimeter handgun turned in by Morris.

Nixon and White testified at trial pursuant to written cooperation agreements. Nixon had been arrested on July 20, 2004, and indicted for illegal possession of a firearm unrelated to the July 10, 2004, shooting. At that time he gave a statement about the Shepard murder; he was not charged with Shepard's murder. White also was arrested on a charge of illegal possession of a firearm, in which Nixon was involved. White had been charged with the murder of Shepard and the assault with intent to murder Brown. Initially he told police that Nixon and the defendant had gotten out of the car, rather than the defendant and himself.

2. *First motion for a new trial.* The defendant argues that trial counsel deprived him of the effective assistance of counsel in two respects, failure to present an alibi defense and failure to challenge a juror who may have been sleeping.

Claims of ineffective assistance of counsel in noncapital cases are reviewed "to see whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically,

whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 n.10 (1977), quoting *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). A strategic decision amounts to ineffective assistance "only if it was manifestly unreasonable when made." *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). See *Commonwealth* v. *Adams*, 374 Mass. 722, 728-729 (1978). Where the claim of ineffective assistance is raised in a motion for a new trial that has been denied, and where the appeal from the denial of that motion is raised in conjunction with a direct appeal under G. L. c. 278, § 33E, we review to determine whether any conduct or omission by counsel "was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

(a) *Failure to present alibi defense.* The defendant contends that trial counsel was ineffective for failing to present alibi witnesses, Sheila and Rob Brady, who would have testified that the defendant was at home at the time of the crime. He claims counsel's decision curtailed the thrust of the defense. The defense at trial was as follows.

Trial counsel aggressively impeached White with prior inconsistent statements, inconsistencies in his direct examination, inconsistencies with Nixon's testimony, and his motives behind the cooperation agreement with the Commonwealth. Counsel aggressively impeached Nixon in a similar manner.

At trial, defense counsel called William Chapman. Chapman and his girl friend had been to a movie during the evening of July 10, 2004. After the movie they smoked some marijuana, then drove to Chapman's sister's home on Northampton Avenue, near the intersection of Beverly Street. They were sitting in the vehicle for about one hour when, at approximately 11:30 P.M., Chapman saw a dark-colored car stop on the opposite side of Northampton Avenue a short distance away. Because the street was so dark, he could not tell if the car had two or four doors.

Chapman saw two men wearing "hoodies" get out of opposite sides of the car. He could not tell if a third person remained in the car, but the engine was running. He watched the two men walk across a vacant lot toward Beverly Street. He then heard gunshots and saw "flames" from the discharge of a

single gun. The two men ran back to the car, which left immediately. He heard a woman shout, "They shot Daylan." Police and an ambulance arrived shortly thereafter. He did not tell police that he had seen the shooting. Chapman, who is a cousin to Leo White and has known White his whole life, testified he is familiar with White's appearance and his gait. He said White was not one of the two men he saw get out of the car.

The defendant now argues that given the state of the evidence, trial counsel was ineffective for failing to present the testimony of two witnesses who could have placed the defendant elsewhere at the time of the shooting. In particular, the defendant contends that the affidavits of Sheila Brady, his girl friend, and Rob Brady, her brother, indicate they were available to testify that on the night of the shooting the defendant did not leave the house he shared with Sheila Brady.

Trial counsel provided an affidavit in which he stated he did not call Sheila Brady as an alibi witness because he thought her alibi testimony would have been weak: he indicated that she told him she had not thought about the defendant's presence in the house on the night of July 10, 2004, for several months. In addition, she recalled that he was out of her sight that night for about ten minutes while she took a shower. Counsel also was concerned that Sheila would have bolstered the Commonwealth's evidence of the defendant's motive, as it was her daughter, Tameka Patterson, who had been shot one week earlier by members of the Gunn Square gang, an incident that the defendant vowed to avenge. Trial counsel also indicated that the case for the defense "was as good as it was going to get, and [he] did not want to damage its strength by ending with a witness [he] felt was not credible." The judge, who also was the trial judge, concluded that counsel's decision not to raise an alibi defense was a strategic one, and not manifestly unreasonable. He further found that counsel's representation of the defendant was "vigorous and coherent, and . . . highly effective." The judge was in the best position to evaluate counsel's decision and his performance. See *Commonwealth* v. *Britto*, 433 Mass. 596, 602 (2001) (we give special deference to decision of judge acting on motion for new trial where he also was trial judge).

Whether to call a witness is a strategic decision. *Id.* The

decision not to call Sheila Brady, whose bias was obvious, and whose alibi testimony counsel determined was weak and likely to dilute the defense that White and Nixon were unreliable and lying, was not manifestly unreasonable. See *Commonwealth v. Hall*, 48 Mass. App. Ct. 727, 733 (2000); *Commonwealth v. McMaster*, 21 Mass. App. Ct. 722, 735-736 (1986) (counsel not ineffective for failing to call alibi witness whose truthfulness was in doubt and who might reinforce Commonwealth's case). Counsel's decision is entitled to "some deference to avoid characterizing as unreasonable a defense that was merely unsuccessful." *Commonwealth v. White*, 409 Mass. 266, 272 (1991).

Contrary to the defendant's assertion that trial counsel presented "half a defense," his trial strategy appears thoughtful, flexible, and alert to nuances that arose during the fluidity of the trial. Rather than resort to every available or conceivable response to the Commonwealth's case, something less experienced counsel may have felt obligated to do, trial counsel exercised good professional judgment by developing a coherent, well-integrated, and plausible defense strategy that a juror indeed might have accepted. The fact that no juror ultimately accepted this strategy is not an indication that counsel was ineffective, or that he provided "half a defense." A defense is not measured by the number of available "tricks" that are pulled out of the proverbial bag, but by its quality. Here, the defense was sound.

With respect to the second witness who was not called, Rob Brady, the judge was not obligated to credit his affidavit. See *Commonwealth v. Lopez*, 426 Mass. 657, 661-663 (1998); *Commonwealth v. Grace*, 370 Mass. 746, 752 (1976). In addition, where Tameka Patterson was his niece, Rob Brady's testimony could have been weakened by a similar bias as Sheila Brady, and he, too, could have bolstered the Commonwealth's evidence of the defendant's motive. The judge also may have considered the defendant's failure to advance alibi in his own affidavit filed in support of his first motion for a new trial. See *Commonwealth v. Goodreau*, 442 Mass. 341, 354 (2004).

We hold that the judge correctly concluded that trial counsel's decision to forgo evidence of alibi was not manifestly unreasonable. There is no need to consider the second part of the analysis of claims of ineffective assistance of counsel.

(b) *Sleeping juror.* The defendant alerted counsel during trial that a juror was sleeping. Counsel told the defendant he did not see it, but if it occurred, it was during direct examination of a Commonwealth witness and therefore would not harm the defense. The defendant now argues counsel was ineffective for failing to bring the matter to the attention of the judge at trial.

In denying the first motion for a new trial, the judge stated, "I make it a point to watch the jury very carefully, and if I had observed a juror sleeping I absolutely would have brought it to counsel's attention and done something about it. Accordingly, I believe that I can state unequivocally that no juror was sleeping in my presence at any point during the trial." The judge was entitled to rely on his own observations at the trial and on his customary practice, see *Commonwealth* v. *Rzepphiewski*, 431 Mass. 48, 54 (2000), with respect to the question of a sleeping juror. See *Commonwealth* v. *Keaton*, 36 Mass. App. Ct. 81, 86-88 (1994). We give special deference to factual findings of the motion judge where he also was the trial judge. See *Commonwealth* v. *Britto*, 433 Mass. 596, 602 (2001). The defendant has failed to show that a juror was sleeping during the trial. He has failed to show in his first motion for a new trial that counsel's performance fell measurably below that of an ordinary fallible lawyer.

3. *Second motion for a new trial.*[1] The defendant's second motion for a new trial alleges three claims of ineffective assistance as to trial counsel, and a claim of ineffective assistance as to first appellate counsel for failing to raise the three claims in the first motion for a new trial.

(a) *Failure to pursue voluntary intoxication defense.* The defendant argues that trial counsel was ineffective by failing to pursue the question of the defendant's voluntary intoxication. Trial counsel filed an affidavit explaining that he made a strategic decision not to pursue the question of the defendant's voluntary intoxication because it depended in large part on the testimony of Leo White,

---

[1]We consider the appeals from the denial of all motions for a new trial consolidated with the direct appeal from a conviction of murder in the first degree under the more favorable standard of review provided by G. L. c. 278, § 33E. See *Commonwealth* v. *Clemente*, 452 Mass. 295, 298 (2008); *Commonwealth* v. *Randolph*, 438 Mass. 290, 294 n.8 (2002).

whose testimony at trial he tried to show was not credible. He could not easily ask the jury to believe White about the defendant's lack of sobriety, but disbelieve him about the details of the crime.

Trial counsel also tried to distance the defendant from the crime scene by showing that Nixon and White were lying about the defendant in order to get the benefit of their respective cooperation agreements with the Commonwealth. A voluntary intoxication defense would have been inconsistent with this strategy because it implicitly could have conceded the defendant's participation in the murder. Moreover, the judge found that there was no indication that the defendant was so debilitated by intoxicants as to warrant an instruction on the effects of voluntary intoxication. See *Commonwealth* v. *James*, 424 Mass. 770, 789 (1997). The judge found trial counsel's strategy, including the decision not to rely on voluntary intoxication, not manifestly unreasonable. Those findings, for reasons stated in Part 2(a), *supra*, are entitled to special deference. The defendant has failed to show that counsel's performance was substandard.

(b) *Failure to call a witness.* The defendant asserts that trial counsel was ineffective for failing to call Admiral Sutherland as a witness to impeach Leo White at the trial. The defendant offered the affidavit of trial counsel, who had spoken with Sutherland before the trial. Sutherland said that he met Leo White in the Hampden County house of correction. Sutherland reportedly said White told him he was going to lie about the defendant's involvement in the murder because the defendant was serving a long prison sentence and had nothing to which he could look forward, whereas White was about to get married.

Trial counsel indicated in the affidavit that he interviewed Sutherland and found him not credible, and decided not to call him because the defense was based on the lack of credibility of the Commonwealth's witnesses. He also was concerned that Sutherland's gang affiliation could taint the defendant. The decision to call a witness is a tactical one, see *Commonwealth* v. *Britto*, *supra* at 602, and the reasons for not calling Sutherland were not manifestly unreasonable. *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998).

Even if Sutherland had been called and did testify as sug-

gested, it would have been cumulative of the extensive impeachment of White by trial counsel. Generally, failure to impeach a witness does not constitute ineffective assistance. See *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001); *Commonwealth* v. *Bart B.*, 424 Mass. 911, 916 (1997).

Finally, the defendant failed to present an affidavit from Sutherland himself indicating he is willing to testify and what he will say. Trial counsel's affidavit is nothing more than hearsay, which itself provides basis to deny the motion for a new trial. *Commonwealth* v. *Ortega*, 441 Mass. 170, 178-179 (2004), and cases cited. We conclude that the decision not to call Sutherland was not manifestly unreasonable, and therefore did not amount to ineffective assistance of counsel.

(c) *Reciprocal discovery.* Just before the beginning of the trial, defense counsel was ordered to make available to the Commonwealth, pursuant to a motion for reciprocal discovery, a tape recording of a telephone conversation between Ana Williams and Leo Lovejoy in which Lovejoy boasted that he fabricated his statements to police concerning this case in order to secure a cooperation agreement with the Commonwealth in an unrelated criminal prosecution he was facing, and for which he was incarcerated at the time. The defendant urges us to overrule *Commonwealth* v. *Durham*, 446 Mass. 212 (2006), contending that the reciprocal discovery order violated his rights under the Fifth and Sixth Amendments to the United States Constitution because it deprived him of the element of surprise in his cross-examination of Leo Lovejoy, who the prosecutor decided not to call because of what she learned about him through reciprocal discovery. In addition, because the prosecutor did not call Leo Lovejoy, the defendant claims he was deprived of the opportunity to call him after learning from Lovejoy's attorney that the witness would invoke his Fifth Amendment privilege. Finally, the defendant contends that counsel was ineffective for failing to preserve this issue for appellate review.

By way of background, according to Bridget Morris, George Lovejoy had not objected to her surrendering the murder weapon to police. George is a cousin of Leo Lovejoy. Morris telephoned Leo Lovejoy's attorney, who acted as an intermediary with police. Leo gave a statement to police about this case and in

return he was released on personal recognizance on the charge on which he was being held, and he entered into a cooperation agreement with the Commonwealth. In his statement to police, dated August 31, 2004, Leo stated that he went to see the defendant at his home shortly after the shooting. The defendant showed him the nine millimeter handgun he used to shoot at Shepard and Brown. He also showed Leo a .25 caliber automatic handgun that jammed after one shot, but he said nothing about who fired that gun. The defendant asked Leo to get some nine millimeter ammunition. Leo never stated he purchased either gun from the defendant. At trial the defendant called George Lovejoy, who testified that he never purchased the nine millimeter handgun from the defendant, contrary to the testimony of Bridget Morris. Leo White testified at trial that he was present when Leo Lovejoy, his brother, purchased the nine millimeter handgun from the defendant on July 11, 2004.

Although the defendant contends that it would have been logical for the Commonwealth to call Leo Lovejoy, there are many reasons why the Commonwealth would not have called him. His testimony would have been inconsistent in several respects with the testimony of White and Nixon, whose testimony already lacked consistency; the two-gun theory he would have introduced would have conflicted with the Commonwealth's one-gun theory; he was yet another witness who would be testifying pursuant to a cooperation agreement; and defense counsel could have argued that Leo White (Leo Lovejoy's brother), not the defendant, showed Leo Lovejoy the guns after the murder and that Lovejoy falsely put them in the defendant's hands to protect White.

The defendant suggests that the timing of the prosecutor's decision not to call Lovejoy relative to the reciprocal discovery order suggests that it was the discovery order that was her reason for not calling Lovejoy. He points out that the prosecutor indicated just before trial, during the discussion about reciprocal discovery, that she intended to call Leo Lovejoy to testify. However, there were other forces at work. Significantly, a capias issued for Bridget Morris the next day for failure to appear as a witness in response to a summons. The same day, March 28, 2006, the prosecutor applied for an order, pursuant to G. L. c. 233, §§ 13A and 13B, and N.C. Gen. Stat. § 15A-812 (2007), that Morris be required by

the State of North Carolina, where she was staying temporarily, to return to Massachusetts to testify in this case. Once Morris testified (March 30, 2006), there was no longer any need to call Leo Lovejoy. At best, his testimony would be cumulative of other testimony, and at worst it created problems for the Commonwealth, as noted above. The defendant's assertion that the prosecutor's decision not to call Leo Lovejoy was a result of reciprocal discovery is speculative.

Also speculative is the defendant's assertion that Lovejoy would have asserted his Fifth Amendment privilege. A judge must determine whether a claim of privilege is valid. See *Commonwealth* v. *Martin*, 423 Mass. 496, 502 (1996). Whether Lovejoy in fact would have claimed the privilege, and whether any such claim would have been valid, is not adequately presented for our review.

Because the entire factual basis of the defendant's argument is defective, we do not reach the constitutional question. We conclude there was no error in the reciprocal discovery order. Because there was no error in the reciprocal discovery order, there could be no ineffective assistance of counsel for failing to preserve properly the issue for appellate review.

(d) *Ineffectiveness of first appellate counsel.* There is no merit to the claim that first appellate counsel was ineffective for failing to raise the foregoing issues in the first motion for a new trial and thereby preserve them for appellate review. Because trial counsel has not been shown to be ineffective with respect to the foregoing claims, first appellate counsel cannot be said to be ineffective for failing to raise them. See *Breese* v. *Commonwealth*, 415 Mass. 249, 252 (1993). Moreover, the defendant has not been harmed because we considered all issues raised in his second motion for a new trial under the standard set forth in G. L. c. 278, § 33E. See note 1, *supra.*

Finally, the judge correctly concluded that first appellate counsel was not ineffective "when he did not raise these issues, because he asserted what he believed to be the best issue[, namely,] (alleged failure to present an alibi defense), which is a 'well-known and time-honored approach,' " quoting *Commonwealth* v. *Walker*, 443 Mass. 213, 228 (2005).

4. *Missing witness instruction.* The defendant challenges the

denial of his request for a missing witness instruction as to Leo Lovejoy. We review the refusal to give such an instruction under the abuse of discretion standard. See *Commonwealth* v. *Anderson*, 411 Mass. 279, 283 (1991), and cases cited.

The record reveals that the murder weapon was linked to the defendant by Bridget Morris, a witness who presented far fewer problems for the Commonwealth than Leo Lovejoy. She actually had possession of the gun; Lovejoy never indicated he took possession of the gun from the defendant. Although Lovejoy also could have connected the gun to the defendant, once Morris testified the Commonwealth did not need his testimony. See *Commonwealth* v. *Alves*, 50 Mass. App. Ct. 796, 802 (2001) (one factor to be considered in giving missing witness instruction is importance of such witness's testimony to party not calling witness). In addition, Lovejoy was not a percipient witness to the crime. He would have added nothing of significance to the Commonwealth's case, and his testimony would have created numerous problems as discussed in Part 3(c), *supra*. The judge did not abuse his discretion by refusing to give a missing witness instruction.

5. *Form of indictment.* We decline the defendant's invitation to overrule *Commonwealth* v. *DePace*, 442 Mass. 739, 743-744 (2004), cert. denied, 544 U.S. 980 (2005), where we held "the indictment charging the defendant with murder alleges the crime of murder in the first degree, and it encompasses all theories of murder in the first degree." The form of the indictment does not offend the ruling in *Apprendi* v. *New Jersey*, 530 U.S. 466 (2000), for reasons we previously have stated. See *Commonwealth* v. *DePace*, *supra*.

6. *Closing argument.* The defendant asserts that the prosecutor improperly vouched for the credibility of Nixon and White. See *Commonwealth* v. *Chavis*, 415 Mass. 703, 712-713 (1993). The defendant did not properly preserve this issue, so we review under the standard of a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Beaudry*, 445 Mass. 577, 585 n.3 (2005). The portion of the prosecutor's closing about which the defendant complains is virtually meaningless, but one thing is clear: she did not vouch for Nixon's or White's credibility. The prosecutor stated that each witness came forward, and was

subjected to cross-examination. She stressed that each "subjected himself to your [the jury's] scrutiny." The argument was not improper, but in any event the judge's pointed instruction that the prosecutor had no "specialized knowledge or opinion about whether Mr. Nixon's [or] Mr. White's testimony was truthful in fact, or not," would have cured any impropriety. See *Commonwealth* v. *Jackson*, 428 Mass. 455, 465-466 (1998).

Defense counsel preserved the question whether the prosecutor improperly shifted the burden of proof. In his closing argument defense counsel theorized that Nixon and White had lied when they denied discussing the shooting, and that in fact they conspired to accuse the defendant falsely. In response, the prosecutor argued that if they were conspiring to accuse falsely the defendant in order to curry favor with the Commonwealth, they would have to be sure that there was no evidence that would have contradicted them. We accept the judge's assessment, at the time, that the prosecutor was not commenting on the defendant's failure to offer alibi evidence. Nevertheless, the judge said he would avert any possibility that the jury might have misconstrued the prosecutor's argument as a comment on the defendant's failure to produce an alibi defense. He instructed the jury that the defendant is presumed innocent, that the burden of proof never shifts to the defendant to prove anything, and that the Commonwealth must prove each element of the crime beyond a reasonable doubt. The defendant did not voice any dissatisfaction with these instructions.

We conclude that there was no impropriety in the prosecutor's closing argument, but even if there were, the judge's instruction cured any error.

7. *Review under G. L. c. 278, § 33E.* We have reviewed the entire case, and conclude that there is no reason to reduce the degree of guilt or order a new trial.

> *Judgments affirmed.*
>
> *Orders denying first and second motions for a new trial affirmed.*