NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-08400

COMMONWEALTH  vs.  JEFFREY VAUGHN.

Suffolk.     January 9, 2015. - May 12, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, & Duffly, JJ.

Homicide.  Practice, Criminal, Affidavit, Disclosure of
    evidence, Conduct of prosecutor, Assistance of counsel,
    Failure to object, Jury and jurors, Capital case.
    Evidence, Exculpatory, Disclosure of evidence, Testimony
    before grand jury, Police report, Impeachment of
    credibility, Hearsay.  Jury and Jurors.


Indictments found and returned in the Superior Court
Department on March 19, 1998.

The cases were tried before James D. McDaniel, Jr., J., and
a supplemental motion for a new trial, filed on December 17,
2009, was heard by Thomas E. Connolly, J.


Eileen D. Agnes for the defendant.
Teresa K. Anderson, Assistant District Attorney, for the
Commonwealth.


SPINA, J.  In June of 1999, a Superior Court jury convicted

the defendant, Jeffrey Vaughn, of murder in the first degree for

the shooting of Robert Mason in a schoolyard in the Dorchester

section of Boston on the night of November 29, 1997.[1]  The
defendant now brings this direct appeal as well as an appeal of
the denial of his motion for a new trial.  Represented by new
counsel on appeal, he claims the judge considering his motion
for a new trial improperly denied it without an evidentiary
hearing, that the Commonwealth failed to disclose exculpatory
evidence timely, that the prosecutor knowingly solicited false
testimony, and that his trial counsel was ineffective.  The
defendant also requests that we exercise our power pursuant to
G. L. c. 278, § 33E, to order a new trial or direct the entry of
a verdict of a lesser degree of guilt.  We affirm the conviction
and the order denying the defendant's motion for a new trial,
and decline to exercise our power under G. L. c. 278, § 33E.

1.  Facts and background.  We recite the facts the jury
could have found, reserving further details for discussion of
the specific issues raised.  On the morning of November 30,
1997, police responded to a report of a dead body in a
schoolyard in the Dorchester section of Boston.  There, they
found the victim, later identified as Robert Mason.  The victim
had been shot five times, twice in the head and once in the
chest and each arm, by a .40 caliber firearm.  Later that day,
John Hyppolite, the victim's close friend, was arrested pursuant

---

[1] The defendant was also convicted of possession of a
firearm.  No argument is made regarding this conviction, and we
do not consider it.

to a warrant issued in an unrelated matter.  As a result of a conversation with Hyppolite, the following day, December 1, 1997, police sought a warrant to arrest the defendant, charging him with the murder of the victim.

The defendant was arrested later that night.  During his arrest, the defendant refused to answer the door of the apartment where police found him attempting to escape out the back.  On December 30, 1997, while awaiting indictment in custody, the defendant saw Troy Meade, a friend and the brother of a woman with whom the defendant had a child, in the holding area of the booking room in the Suffolk County jail.  Meade engaged the defendant in a conversation about the murder.  The defendant admitted killing the victim because the victim had once held a brother of the defendant, Walter "Wally" Vaughn, upside down over a second-story balcony at a party.  That brother had since been murdered.  The defendant also stated that it had been his intention to kill Hyppolite because he had witnessed the murder but the defendant's other brother, Jamal, was in the way.  The weapon the defendant said he used was a .40 caliber firearm.  Meade had seen the defendant with a .40 caliber pistol several weeks before the murder.

The defendant's statement to Meade referenced a series of escalating events in a conflict between, on one hand, the defendant and his brothers and, on the other, two brothers by

the name of Tim and Eric Mathis. The defendant suspected Tim Mathis of killing the defendant's brother, Wally Vaughn, while the defendant was incarcerated.

In addition to the balcony incident with Wally Vaughn, the defendant further knew that, while the defendant had been in prison on an unrelated matter, the victim had been the driver in a drive-by shooting targeting Meade, on April 30, 1997. The Mathis brothers were passengers in that vehicle as was Hyppolite. In a telephone conversation made from his place of incarceration, the defendant promised Meade that he would "take care" of the perpetrators, including the victim. This conversation took place while Meade was at the house of Jeff Pruitt, another friend of the defendant.

The defendant was released from prison in early November, 1997. Shortly after his release, the defendant attended a party; watched a movie, rewinding and replaying certain portions of the videotape constantly; and stated that he would seek revenge on unnamed parties. After his release, he also reiterated to Hyppolite this desire for revenge, specifically naming Tim Mathis.

On the night of November 29, 1997, Jamal Vaughn and Hyppolite met the victim at his house to go socializing. Later in the evening, they were joined by the defendant. Eventually the four of them arrived at a nearby schoolyard where it was

common to drink alcohol. The usual practice was to loiter on the stairs to keep watch for police surveillance. On this night, however, the defendant suggested the group move to the side of the school. The group moved.

There the conversation between the defendant and the victim quickly turned to the defendant's deceased brother Wally and encompassed the occasion on which the victim had held Wally upside down over a second-story balcony. The defendant grew emotional during this discussion and displayed a handgun. At the sight of the weapon, the victim became visibly nervous and asked the defendant to be careful. Hyppolite intervened and attempted to defuse the situation. Seemingly mollified, the defendant put the gun away. Hyppolite turned away from the pair to relieve himself and heard a gunshot. He turned around in reaction and saw the victim falling to the ground with the defendant standing over him with the gun in his hand. He saw the defendant shoot the victim several more times after he had fallen to the ground, including twice in the head.

The group fled. Jamal Vaughn ran to a local bar and then to meet his older brother Dwayne Vaughn at their sister's house. Hyppolite went in another direction, and the defendant soon joined him. The defendant warned him not to tell others of the events of the evening. Hyppolite insisted that the defendant had taken his retribution against the wrong person. They

continued on to Hyppolite's house, where the defendant persistently asked to use the telephone over Hyppolite's initial refusal. Fearing the defendant, who still had the gun, Hyppolite relented. The defendant called his older brother Dwayne.

Wishing to vacate the area, Hyppolite called for a ride from a friend. The defendant, meanwhile, stated that more retribution was to come. Hyppolite's friend arrived to give him the requested ride. The defendant asked if they could bring him to his brother Dwayne's house. The driver agreed. As they drove, the defendant saw two sisters with whom he was familiar: Sherelle and Jeanine Jackson. Jeanine was a former girl friend of the defendant.

The defendant requested the driver pull over. The defendant took Jeanine Jackson out to the back of a house for several minutes. Sherelle Jackson overheard part of the conversation between her sister and the defendant in which the defendant told Sherelle that something would be found in the schoolyard. After waiting a while, Hyppolite went to retrieve the defendant at the request of the driver.

The defendant returned to the car, this time with the Jackson sisters. The group, now five in number, drove to the residence of the defendant's sister where they met Dwayne Vaughn. There, the defendant and Jeanine Jackson got out of the

car. Hyppolite, the driver, and Sherelle Jackson waited in the car. Jeanine returned to the car a short while later, soon followed by the defendant. After one more stop, the driver and Hyppolite left the defendant and the Jackson sisters at a residence. Before parting, the defendant repeatedly insisted that Hyppolite speak to Jamal the next day.

At this location, the defendant and the Jackson sisters entered an apartment belonging to one of Sherelle's friends. There, Sherelle was privy to a further conversation between the defendant and Jeanine in the kitchen. The defendant said he had "eight more to go." Sherelle's memory of this conversation consisted of portions she had overheard mixed with details her sister had later supplied.

The next day, the defendant called Hyppolite. The defendant warned Hyppolite to speak to "nobody" about the events of the previous night and, if asked, to say that the group had actually been at Pruitt's house the night before. Jamal Vaughn went to Hyppolite's house after this conversation. Hyppolite confronted Jamal about the killing. Jamal responded only that the victim had gotten what he deserved. Later that evening, Boston police officers arrested Hyppolite.

At trial, the defendant relied upon a misidentification defense. Hyppolite testified that the defendant was the shooter. After initially stating an unidentified third party

was present (contradicting his testimony before the grand jury in this case), Jamal Vaughn eventually testified that Hyppolite in fact had pulled the trigger.

The defendant called as a witness Keith Pomare, a friend. Pomare testified that on the night in question he had approached the schoolyard looking for friends and saw the victim, Hyppolite, the defendant, and Jamal there.  The group was "bebopping and rapping" and "messing around with beats."  Unseen by the group, Pomare testified that he heard and saw John Hyppolite shoot the victim.  Still unseen in the aftermath of the shooting, Pomare testified that he stayed at the scene as the group fled and then walked over to the body.  He then fled himself.  Pomare admitted he had not testified to these facts before the grand jury and that he had deliberately lied on that occasion.

The jury returned a verdict of guilty of murder in the first degree based on a theory of deliberate premeditation with malice aforethought.  Following the trial, the defendant moved for a new trial based on newly discovered evidence.  In support of this motion, the defendant proffered two virtually identical affidavits from one Carl Jones, dated September 5, 2000, and December 9, 2008.  The affidavits give no home address nor other identifying information of the affiant.

In these affidavits, Jones swore that, on the night in question, he saw four black males in the schoolyard from his residence across the street. From his unknown vantage point, he saw that three of the males were six or more feet tall and that one of the males was five feet, four inches tall.[2] Jones swore that he saw one of the taller males shoot one of the other tall males, matching the description of the victim. The affidavits go on to state that after the group fled, a previously unnoticed male walked over to the body, looked upon it, and then fled. The affidavits conclude that several days later Jones saw television reports relating to the murder and that the shorter male, presumably the defendant, was identified as the murderer. Jones asserts that police had arrested the wrong individual.

The motion judge, who was not the trial judge, rejected these affidavits as not credible and denied the motion for a new trial. The defendant appealed claiming several errors. We address each claim of error in turn.

2. Motion for a new trial. The defendant claims as error the denial of his motion for a new trial without an evidentiary hearing. "The trial judge upon motion in writing may grant a new trial at any time if it appears that justice may not have been done." Mass. R. Crim. P. 30 (b), as appearing in 435 Mass.

---

[2] The victim was approximately six feet, two inches tall. The defendant is approximately five feet, six inches tall. Hyppolite was more similar in height to the victim than the defendant. All were black males.

1501 (2001). The defendant bears the burden of proving the facts on which he relies in his motion for a new trial. Commonwealth v. Brown, 378 Mass. 165, 171 (1979), S.C., 470 Mass. 595 (2015). Where the appeal from the denial of a motion for a new trial is considered with the direct appeal from the defendant's conviction of murder in the first degree, we review the denial of that motion to determine whether an abuse of discretion or other error of law occurred. Commonwealth v. Savann Leng, 463 Mass. 779, 781 (2012). If such abuse or error is found, we look to see if it created a substantial likelihood of a miscarriage of justice. Id. "Where, as here, the motion judge was not the trial judge and the motion judge did not make credibility determinations arising from an evidentiary hearing, we consider ourselves in as good a position as the motion judge to review the trial record. . . . Nevertheless, we review a judge's decision on a defendant's motion for a new trial based on the common-law claim of newly discovered evidence for a significant error of law or other abuse of discretion." (Citations and quotations omitted.) Commonwealth v. Sullivan, 469 Mass. 340, 351 (2014).

The defendant must support his motion for a new trial with affidavits. Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). The primary purpose of Mass. R. Crim. P. 30 (c) (3) is to encourage the disposition of motions for

postconviction relief on the basis of affidavits alone.  See Reporter's Notes to Rule 30 (c) (3), Massachusetts Rules of Court, Rules of Criminal Procedure, at 222-223 (Thomson Reuters 2014).  See also Commonwealth v. Stewart, 383 Mass. 253, 260 (1981).  The decision to hold an evidentiary hearing on a motion for a new trial is "left largely to the sound discretion of the judge."  Id. at 257.  Only when the motion and affidavits raise a "substantial issue" is an evidentiary hearing required. Commonwealth v. Chatman, 466 Mass. 327, 334 (2013).

"In determining whether a 'substantial issue' meriting an evidentiary hearing . . . has been raised, we look not only at the seriousness of the issue asserted, but also to the adequacy of the defendant's showing on the issue raised."  Stewart, 383 Mass. at 257-258.  "[N]ewly discovered evidence that is cumulative of evidence admitted at trial tends to carry less weight than new evidence that is different in kind." Commonwealth v. Grace, 397 Mass. 303, 305-306 (1986).  In determining the adequacy of the defendant's showing, the motion judge may consider whether the motion and affidavits contain credible information of sufficient quality to raise a serious question.  See Commonwealth v. Freeman, 442 Mass. 779, 792 n.14 (2004) (motion judge may assess credibility of defendant's claims).

"When weighing the adequacy of the materials submitted in support of a motion for a new trial, the judge may take into account the suspicious failure to provide pertinent information from an expected and available source." Commonwealth v. Goodreau, 442 Mass. 341, 354 (2004). Such a failure "speaks volumes." Id. "A judge is not required to accept as true the allegations in a defendant's affidavits even if nothing in the record directly disputes them," Commonwealth v. Rzepphiewski, 431 Mass. 48, 55 (2000), or if the affidavit is uncontroverted. See Commonwealth v. Thurston, 53 Mass. App. Ct. 548, 551 (2002). Even where, as here, the motion judge did not preside at the trial, the credibility, weight, and impact of the affidavits are entirely within the motion judge's discretion. See Commonwealth v. Jones, 432 Mass. 623, 634 (2000). In such cases it is important that the judge provide some reasons for accepting or rejecting a particular affidavit or group of affidavits, to assist the appellate court in understanding whether the judge acted within his or her discretion. Id.

The Jones affidavits essentially identify Hyppolite as the shooter and corroborate Pomare's testimony. The motion judge, however, did not credit the Jones affidavits. The judge found that the absence of identifying information, such as Jones's address and birth date, was troubling given the passage of time since the trial. The judge similarly gave weight to the fact

that, in the ten years since the verdict, Jones never had contacted the police to give a statement regarding his knowledge that the police had arrested and prosecuted an innocent man. The judge also acknowledged the Commonwealth's presentation of a letter addressed to Jamal Vaughn from the defendant and an unsigned affidavit accompanying the letter. In the letter, the defendant strongly asks Jamal to sign the affidavit which the defendant had prepared in Jamal's name. On these bases, the judge simply refused to believe anything contained within the affidavits. On these facts, we cannot say that the judge's decision not to give weight to the affidavits was the product of an error of law or an abuse of the judge's discretion.

Similarly, the judge was within his discretion in denying the motion for a new trial without an evidentiary hearing. The assertion that a person matching Hyppolite's description was the shooter and that a fourth person approached the body of the victim after others present in the schoolyard had fled was merely cumulative of the evidence offered by the defendant at trial.

The defendant relies on Commonwealth v. Trung Chi Truong, 34 Mass. App. Ct. 668 (1993), for support. Nothing in that case leads us to a different conclusion. In Truong, the defendant was convicted of conspiracy to commit armed robbery after two men and a woman robbed a jewelry store. Id. at 668-669. The

defendant's wife was charged for the robbery as well.  Id. at 669.  At his trial, the defendant and his wife both testified that the defendant had picked up his wife and daughter for a doctor's appointment at the time of the robbery.  Id. at 669-670.  The Commonwealth later filed a nolle prosequi in the case of the wife after the fingerprints at the crime scene were matched to a different person.  Id. at 673.  The defendant relied on this fact in his motion for a new trial, arguing that, as this new match pointed to a different female robber, his alibi defense that he was with his wife and daughter at the doctor's appointment was bolstered.  Id. at 674.  The Commonwealth argued that the evidence was cumulative and not material.  Id. at 673.  The motion judge denied the motion without an evidentiary hearing.  Id. at 670.  The Appeals Court determined that the motion judge had abused his discretion because "the prosecution relied upon evidence that the defendant's wife participated in the robbery as evidence from which the jury could infer the defendant conspired with her to commit the robbery and which refuted the defendant's alibi that he was taking her and their daughter to the doctor."  Id. at 674.  This reliance, taken in conjunction with the relative weakness of the remainder of the Commonwealth's evidence, meant that the Commonwealth's later decision to file a nolle prosequi

in the case of the wife raised a substantial issue in the defendant's case.  Id. at 674-675.

In the instant case, the Jones affidavits do not remove an essential pillar of the Commonwealth's evidence comparable to the decision to nolle prosse the wife in Truong, which called into question an important inference upon which the Commonwealth had relied in seeking a conviction of the defendant.  The affidavit proffered by the defendant only parrots some of the evidence at trial.  Accordingly, we find no abuse of the discretion of the motion judge in denying the defendant's motion for a new trial without an evidentiary hearing.

3.  Failure to disclose exculpatory evidence.  Troy Meade testified under oath about the April 30, 1997, shooting in which Meade was the victim in two separate grand jury investigations.[3] The first investigation occurred on June 3, 1997, and named John Doe as the subject.  The second occurred on April 22, 1998, and named Tim Mathis as the subject.  On the eve of trial the prosecutor learned of Meade's testimony about the April 30, 1997, shooting and disclosed it to the defendant pursuant to a general request for discovery of exculpatory evidence.  As we will explain, some uncertainty exists as to what information exactly the defendant received, but at a minimum, it was the

---

[3] The grand jury testimony in this case remains impounded. We refer only to that grand jury testimony cited by the parties in their briefs before this court.

minutes of Meade's grand jury testimony on June 3, 1997. The defendant now claims that he never received the minutes of Meade's grand jury testimony from April 22, 1998. The defendant also argues that the Commonwealth's failure to disclose the police reports relating to the April 30, 1997, shooting was a failure to disclose exculpatory evidence. The late disclosure and failures to disclose, taken together or singly, the defendant urges, denied him a fair trial.[4]

The defendant asserts specifically that the alleged failure to disclose the April 22, 1998, grand jury minutes cast Meade's disclosed testimony before the grand jury on June 3, 1997, in a misleading light and thus deprived him of an opportunity to demonstrate Meade's bias and motivation to lie. The police reports, the defendant continues, demonstrate Hyppolite's motive to commit the murder. We address each in turn.

a. Grand jury minutes. The Commonwealth asserts that the defendant received the April 22, 1998, grand jury minutes at the same time he received the June 3, 1997, grand jury minutes. At trial, the judge addressed the handling of both the grand jury investigation for this case as well as those "that relate to

---

[4] The defendant now argues that these nondisclosures were intentional but offers no evidence in support of this argument. Trial counsel never alluded to any such suspicion. We discern no basis in the record to support the contention that the Commonwealth intentionally withheld evidence. We therefore analyze this issue under the assumption that the Commonwealth acted in good faith.

Troy Meade" and ordered both marked for identification.  The

exhibit list shows two entries for identification of grand jury

minutes but does not describe them further.  We conclude that it

is safe to say that one entry accounts for the minutes of the

grand jury investigating the defendant and the other for Meade's

testimony in the grand jury investigations in which Meade was

the alleged victim.  The question we must resolve is whether the

second entry includes Meade's testimony of April 22, 1998.

The Commonwealth attempts to resolve this uncertainty by

pointing to questions asked by defense counsel containing

information contained in the April 22, 1998, grand jury

transcript but not the June 3, 1997, grand jury transcript.

Specifically the Commonwealth highlights a question by defense

counsel to Meade referencing the fact that Meade had identified

the victim to the police as one of four individuals in the car

on April 30, 1997.[5]  Although the fact that four people were in

the car on that date had come out during the trial already, no

mention had been made at any point of the fact that it was Meade

who had told police four people were in the car and identified

them.  The police reports, supplied in the record, demonstrate

that Meade did make such an identification to the police, but

---

[5] Q.:  "You knew of [the victim] enough that you could
          identify him to the police as one of the four people
          in that vehicle where someone was trying to kill you,
          is that so?  You have to say yes or no."

A.:  "Yes, sir."

the defendant already had stated he never received them.  Thus the only basis for the statement Meade had identified four people came from the April 22, 1998, grand jury minutes, contradicting the defendant's claim that his counsel never received them.

Even if we were to err on the side of caution and assume without deciding that the prosecution did not deliver the April 22, 1998, minutes to the defendant and that those minutes were exculpatory, the defendant fares no better.  "Where the prosecution denies the defendant exculpatory evidence but the defendant . . . has made only a general request, this court will order a new trial or reduction of the verdict whenever the court concludes that there is a substantial likelihood of a miscarriage of justice."  Commonwealth v. Simmons, 417 Mass. 60, 73 (1994).  We easily conclude that when the Commonwealth fails to provide grand jury testimony by a nonpercipient witness on an unrelated incident that the defendant would use only to impeach that witness and the defendant has already successfully called into question the witness's truthfulness, no substantial likelihood of a miscarriage of justice exists.  The issue at trial here was the identity of the person who shot Robert Mason.  Meade did not witness that shooting.  His bias and prior contradictory testimony already had been considered by the jury in weighing his testimony as to the defendant's jailhouse

confession and likely would not have affected the trial's outcome.

b. <u>Police reports</u>.  For substantially the same reasons, we find no error in the nondisclosure of the police reports of the April 30, 1997, shooting.  The defendant argues that it is only in these reports that Hyppolite's motive to murder the victim emerges.  The police reports in question do not mention Hyppolite.  The defendant sees this lack of mention as support for his defense that Hyppolite was motivated to kill the victim to extinguish any evidence of his involvement in the shooting. The defendant's reading of the reports is not reasonable.

The police reports regarding the April 30, 1997, shooting of Meade simply describe police efforts to ascertain the identity of the perpetrators of that crime.  The reports do not mention Hyppolite as a suspect.  From this fact, the defendant asserts that Hyppolite killed his friend more than six months later in an effort to remain unsuspected.  The defendant's theory is speculative, convoluted, and confusing.  We cannot interpret the failure of the police reports to mention Hyppolite as evidence that an affirmative desire to remain unsuspected prompted Hyppolite to kill Mason.  Their nondisclosure was not error.  But again, even were we to assume without deciding that the reports may be exculpatory, we would still conclude that their nondisclosure after a general request did not result in a

substantial likelihood of a miscarriage of justice because they do not address the issue of the identity of Robert Mason's killer.  See Simmons, 417 Mass. at 73.

4.  Prosecutorial misconduct.  The defendant claims that the prosecutor knowingly elicited false testimony from Meade and failed to correct it, in violation of Napue v. Illinois, 360 U.S. 264 (1959).  At issue is the prosecutor's attempt to establish the nature of any promises made by the district attorney's office in connection with Meade's testimony at trial. During the course of that effort, the prosecutor elicited from Meade that the first time he and Meade had contact in this case was when Meade was called to testify in front of the grand jury.[6] The defendant cries foul.

According to the defendant, the first time Meade was brought before a grand jury in this case was January 30, 1998.

---

[6] Q.:  "It's fair to say, sir, that when you came to the Suffolk County Grand Jury to testify in this case you did not even know that you were being brought in to testify?"

A.:  "Exactly."

Q.:  "Did you call the Suffolk County D.A.'s office to say that you had information?"

A.:  "No, I didn't."

Q.:  "Is it fair to say the first time you came into contact with the Suffolk County District Attorney's office was when they brought you into court?"

A.:  "Yes, sir."

Visitors' logs from the jail obtained by the defendant show the prosecutor visiting Meade on January 15, 1998, fifteen days prior. Therefore, the defendant concludes, the prosecutor knowingly elicited false testimony and failed to correct the record.

This argument is part of the effort to project Meade's testimony as the product of collusion between Meade and the prosecutor. The defendant, however, is mistaken in his factual understanding that the first time Meade met with the prosecutor was on January 30, 1998, when Meade testified before the grand jury. The docket shows an oral motion for a writ of habeas corpus by the prosecutor on December 29, 1997, for a witness to appear the next day. The Commonwealth has produced that writ commanding that the sheriff of Suffolk County produce Meade on December 30, 1997, to Suffolk Superior Court. The prosecutor first met with Meade on December 30, 1997, when he was brought to "court," as he had testified.

Similarly, the defendant claims he was denied a fair trial when Meade testified at trial that he could not identify the shooter in the April 30, 1997, incident, which was inconsistent with his April 22, 1998, grand jury testimony. The defendant argues that the prosecutor had access to the April 22, 1998, grand jury minutes, failed to correct this point, and that failure amounted to prosecutorial misconduct. "That a

prosecution witness contradicted [himself] is insufficient to show that the Commonwealth knowingly used perjured testimony." Commonwealth v. Zuluaga, 43 Mass. App. Ct. 629, 646 (1997). The defendant has failed to establish prosecutorial misconduct.

5. Ineffective assistance of counsel. The defendant makes multiple claims that he received ineffective assistance of counsel. To succeed on these claims, the defendant must demonstrate that (1) that there was "serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer," and (2) that this substandard performance "likely deprived the defendant of an otherwise available, substantial ground of defence." Commonwealth v. Britto, 433 Mass. 596, 601 (2001), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). Because this is a review under G. L. c. 278, § 33E, our degree of scrutiny is heightened, and we search for any unpreserved error that might have created a substantial likelihood of a miscarriage of justice. Britto, supra at 601-602, citing Commonwealth v. Wright, 411 Mass. 678, 682 (1992). We turn to the defendant's claims.

a. Access to grand jury minutes. At trial, the defendant was restricted personally from viewing the grand jury minutes relating to the April 30, 1997, drive-by shooting. The defendant now argues that his counsel gave ineffective

assistance in failing to object to this restriction. The defendant asserts he would have had greater knowledge than his attorney relative to the context of the testimony presented. This restriction, he argues, deprived him of the opportunity to present a full defense.

Even accepting the defendant's proposition as true that he had greater knowledge than his attorney of the facts of an unrelated shooting that occurred while the defendant was incarcerated, counsel was not ineffective in failing to object to the protective order because such an objection would have been futile. Rule 14 (a) (6) specifically allows discovery to be restricted to defense counsel alone for cause shown. Mass. R. Crim. P. 14 (a) (6), as appearing in 442 Mass. 1518 (2004). The decision to enter such an order is within the trial judge's discretion. Commonwealth v. Holliday, 450 Mass. 794, 803, cert. denied, 555 U.S. 947 (2008). Here, the judge was well within his discretion in granting the restricting order given the defendant's expressed threats against witnesses. Defense counsel's failure to make a clearly futile objection to the protective order was not behavior falling measurably below that of an ordinary fallible lawyer.

b. Sleeping juror. The defendant argues that he received ineffective assistance of counsel when his attorney failed to pursue the possibility of a sleeping juror. The defendant

alleges that his counsel should have submitted affidavits to bolster his claim that a juror was inattentive during the presentation of the evidence. Defense counsel twice brought to the judge's attention the issue of a juror appearing to be asleep during trial.[7] The defendant urges that his right to an impartial attentive juror was compromised when the judge and defense counsel took no further action.

The defendant has failed to meet his burden. Although it is true that a judge must take action when confronted with evidence of a sleeping juror, the nature of that action is within the judge's discretion. Commonwealth v. Beneche, 458 Mass. 61, 78 (2010). The defendant must show that the judge abused his discretion by making an arbitrary or unreasonable decision. Id. Here, the defendant has not made such a showing.

Defense counsel first reported during a bench conference that he had observed a juror sleeping, including sleeping during the judge's instructions. He also offered that the prosecutor had seen it as well. Nothing in the record indicates the prosecutor's observations of the juror or his agreement or disagreement with defense counsel's observations. Defense counsel offered no further description of why he thought the

---

[7] The second time defense counsel also requested that a second juror be removed from the panel because defense counsel had observed the second juror for ten minutes during the lunch break the previous day "standing [in public], staring off into space with his hands folded, talking to himself on the street corner."

juror was sleeping beyond the excuse that he had not brought up the issue earlier in light of the possibility he may have observed a "nervous reaction." Defense counsel did not request any further action at the time of the initial report. In response to defense counsel's reports, the judge made his own observations of the juror. The judge did not observe the juror sleeping. He promised to continue his observations and to act should defense counsel's concerns prove founded. The next day, defense counsel revisited the issue, offering no further description of the asserted fact that the juror was sleeping and offering no new evidence that the juror had fallen asleep since the initial report. He asked that the juror be removed. The judge declined to do so. In his affidavit in support of the defendant's motion for a new trial, defense counsel did not elaborate any further on his report at trial.

It is clear that the trial judge did not find defense counsel's assertions reliable enough to warrant further action, particularly where counsel said that the juror slept during the judge's instructions to the jury and the judge would necessarily have been looking at the jury. Yet the judge noticed nothing unusual. Contrast Commonwealth v. McGhee, 470 Mass. 638, 645 (2015) (report from adjacent juror of snoring enough to prompt further action). Defense counsel's report gave no description of the characteristics of the juror's alleged slumber beyond

likening it to a "nervous reaction," an empty illustration explained by myriad possibilities.  More importantly, defense counsel did not ask for a voir dire.  In fact, he initially requested the judge do nothing at that time.  The judge was entitled to rely on his own observations to reach the conclusion that the report of a sleeping juror was not sufficiently reliable to warrant further action when made only by defense counsel without a request for a voir dire.  McGhee, supra at 645 (trial judge should first assess reliability of report before taking further action).  We defer to the findings of the trial judge on a claim alleging a sleeping juror.  Commonwealth v. Morales, 453 Mass. 40, 47 (2009).  The trial judge did not abuse his discretion in his response to defense counsel's claim that the juror was sleeping.

Nor would the submission of affidavits by trial counsel have affected this outcome.  Counsel twice brought the issue before the trial judge.  The second time the judge assured defense counsel that he was monitoring the juror.  We cannot accept as true that a juror was in fact sleeping and therefore cannot speculate upon any possible effect of further affidavits not proffered in this regard.  Simply put, without more, counsel's failure to submit affidavits at that juncture was not behavior falling measurably below that which might be expected from an ordinary fallible lawyer.

c.  Failure to call or examine witnesses.  The defendant claims that his trial counsel was ineffective with respect to several decisions regarding witnesses.  "Trial tactics which may appear questionable from the vantage point of hindsight . . . do not amount to ineffective assistance unless 'manifestly unreasonable' when undertaken."  Commonwealth v. Haley, 413 Mass. 770, 777-778 (1992), citing Commonwealth v. Sielicki, 391 Mass. 377, 379 (1984).  Failure to call a witness will not be considered ineffective assistance of counsel absent a showing of prejudice.  Commonwealth v. White, 409 Mass. 266, 275 (1991).  We address the defendant's arguments.

i.  Jeanine Jackson.  The defendant argues that he received ineffective assistance of counsel when defense counsel failed to call Jeanine Jackson to impeach the testimony of Sherelle Jackson, her sister.  The defendant contends that Jeanine would have testified that the defendant had never told her he had shot the victim, contradicting Sherelle Jackson's testimony.  The Commonwealth answers that defense counsel had already impeached Sherelle Jackson by other means including noting her outstanding warrants and criminal charges and inconsistencies between her trial and grand jury testimony.  Furthermore, in her own testimony, Sherelle freely admitted that her memory was affected by hearsay reported to her the same day.  In any event, the only effect of calling Jeanine Jackson would have been for the

further impeachment of Sherelle. This failure to provide cumulative impeachment testimony was not ineffective assistance of counsel. See Commonwealth v. Duran, 435 Mass. 97, 105 (2001); Commonwealth v. Fisher, 433 Mass. 340, 357 (2001).

ii. Troy Meade. The defendant argues that defense counsel was ineffective by reason of his failure to object to Meade's testimony on the basis of hearsay or lack of foundation regarding the July, 1997, telephone call in which the defendant told Meade the defendant would take care of the persons who committed the April 30, 1997, drive-by shooting. The defendant's argument is without merit. It is uncontroverted that statements of the defendant in a criminal case are not hearsay. Commonwealth v. Marshall, 434 Mass. 358, 365-366 (2001). Similarly, there is no merit to the defendant's argument that defense counsel should have objected to Meade's testimony for lack of foundation. The evidence was substantial that Meade and the defendant had been familiar with each other for years. In fact, Meade's sister and the defendant had a child together. "Identification of telephone voices by witnesses familiar with the voice of the identified person has long been permitted by the law of the Commonwealth." Commonwealth v. Perez, 411 Mass. 249, 262 (1991) (citations omitted). Any objections on these bases would have been futile. Defense counsel was not ineffective in this regard.

iii.  Jeffrey Pruitt.  Defense counsel vigorously cross-examined Meade about the details of the July, 1997, telephone call in order to cast doubt on the veracity of Meade's testimony.  The defendant now alleges that his counsel's failure to examine Jeffrey Pruitt on the issue for the same purpose constitutes ineffective assistance.  We disagree.  The defendant points to an affidavit submitted after the trial to indicate that, had Pruitt been examined on this issue, he would have denied Meade's presence in his house during the telephone call in question.  Defense counsel had focused his direct examination of Pruitt on the events surrounding the murder and an incident in which Pruitt claimed Meade told him he had lied about the defendant's jailhouse confession.  The Commonwealth offered evidence of the July, 1997, telephone call to demonstrate motive, an element the Commonwealth was not under an obligation to prove.  The central issue in the case was the resolution of the identity of the shooter in the schoolyard on the night of November 29, 1997.  Even were we to take Pruitt's affidavit at face value, the failure to offer evidence casting further doubt on the already-impeached testimony of a witness who did not observe the shooting and thus could not identify the shooter was not behavior falling measurably below that of an ordinary fallible lawyer nor did it deprive the defendant of a substantial ground of defense.

iv.  Marcel Morale.  The defendant argues that he received ineffective assistance of counsel when his attorney failed to investigate, interview, and present as a witness Marcel Morale, a person interviewed by the police after the shooting who resided within sight of the school.  In the police interview, Morale indicated she saw four men run from the schoolyard after the shooting.  The defendant claims that this testimony corroborates that of Keith Pomare by placing four people at the scene and making it more likely that Hyppolite was the shooter.  Morale's general observations of four people running away cannot be considered exculpatory evidence.  Morale told police that one male ran through a hole in a fence and then joined the three other males in fleeing the scene.  Even were we to take Morale's police interview as true that there were four people present in the school yard after the shooting on November 29, 1997, her report would still not corroborate Keith Pomare's testimony.  Pomare stated under oath that he stayed hidden until the others had fled and walked around the body.  Pomare testified that he then fled to his grandmother's house and did not meet up with the group that had just fled the school yard.  Pomare's testimony and Morale's police report are not consistent with one another and thus the police report cannot be said to corroborate Pomare's testimony.  Defense counsel's failure to call Morale did not prejudice the defendant's case by depriving him of a

substantial ground of defense. Defense counsel was not ineffective in this regard.

6. G. L. c. 278, § 33E, review. The defendant requests that we reduce his conviction of murder or order a new trial under G. L. c. 278, § 33E, in the interests of justice after a consideration of the evidence. We have reviewed the entire record and conclude that there is no reason to exercise our power under G. L. c. 278, § 33E.

Judgment affirmed.

Order denying motion for a new trial affirmed.